**Jessie L. JACKSON, Petitioner–Appellant,**

v.

**Flora HOLLAND, Respondent–Appellee.**

No. 01–5720.

United States Court of Appeals, Sixth Circuit.

Aug. 21, 2003.

Caryll S. Alpert, Asst. F.P., Defender, Federal Public Defender's Office, Nashville, TN, for Petitioner–Appellant.

Elizabeth B. Marney, Asst. Atty. General, Office of the Attorney General, Nashville, TN, for Respondent–Appellee.

BEFORE: MERRITT and DAUGHTREY, Circuit Judges; and RUSSELL, District Judge.*

RUSSELL, District Judge.

Petitioner Jessie Jackson appeals the district court's grant of summary judg-

---

* Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

ment to the respondent, Warden Flora Holland, upon his petition for habeas corpus under 28 U.S.C. § 2254. The lower court concluded that although the petitioner had demonstrated a constitutional deprivation of his Sixth Amendment right to effective assistance of counsel, the deferential standard of review of 28 U.S.C. § 2254(d) prohibited it from granting relief. We agree with the former conclusion but not the latter, and we therefore **RE-VERSE** the decision of the district court.

## BACKGROUND

### A. Factual Background

In 1987, Jackson was convicted of first degree murder and sentenced to life imprisonment. The underlying facts are not disputed. As set forth by the Tennessee Court of Criminal Appeals, they are as follows:

On February 2, 1986, Sharon Bryant and her boyfriend, the victim James Crawley, hosted a party at the apartment they shared at the University Court housing project in Nashville, Tennessee. The purpose of the party was to raise money via a card game called "Tonk." The victim needed the money for car repairs. Numerous people had been invited to the party, including the defendant, who was a friend of the victim.

The party was already in progress when the defendant arrived with the victim at some time between 9:00 and 10:45 p.m. After arriving, the defendant alternated between playing cards and going upstairs with the victim. Ms. Bryant testified that she had heard arguing the last time the defendant was upstairs with the victim, and that she had told them to come back downstairs. When they did, the defendant resumed playing cards. Bryant also testified that the defendant and the victim had both been "high." The defendant denied that he had been arguing with the victim.

After the defendant had resumed playing cards, three more male guests arrived and wanted to play dice. The victim then left, telling Bryant that he was going to get some dice. He also told her, "I have the money to get my car fixed," and patted one of his pockets. The defendant testified that the real reason the victim left was to sell some cocaine. Bryant testified that if the victim had had the money, it had come from some source other than the card game. [FN 1: After the victim had been taken to the hospital, his clothing was searched and twenty-five dollars ($25) cash was found. Bryant testified that the victim had needed one hundred dollars ($100) for the car repairs.] Shortly thereafter, the defendant asked Bryant where the victim had gone. She told him that he had gone to get some dice. The defendant then left, leaving some money on the card table. A few minutes later, the victim's cousin came by and told Bryant that her boyfriend had been shot.

The victim's body was lying in front of a long, rectangular apartment building in University Court. The building was located on a corner, with its long side facing one street and running parallel with it ("A Street"), and running perpendicular to the intersecting street ("B Street"). [FN 2: The actual names of the streets were not discernable from the record. These arbitrary names are designated in an effort to lend clarity to the description of the murder scene.] The victim had been shot in front of the far end of the building, looking down A Street from the corner. This building was several buildings away from the one in which Bryant's apartment was located. There was testimony that the area

where the victim was shot was known for quick and numerous drug transactions. There was a streetlight nearby.

Bryant testified that on arriving at the place where her boyfriend was lying, she had seen the victim's aunt, Freddie Davis, Jonathan Hughes and "another guy" there. Then numerous other people arrived. She testified that the defendant had arrived at about the same time as the ambulance. At that point, she testified, the defendant had tried to comfort her. She further testified that she had spoken with the defendant after she got back from the hospital and that he had mumbled something that she had thought was, "I didn't mean to do it." She testified that when she had questioned him about this, he said, "They didn't have to do it. They didn't have to kill him. He was too little to get shot. They could have beat him up." She testified that she had then asked him who did it, and he had replied, "They said, Frankenberry did it" and "you know they got into an argument," to which she had replied, "I heard." Bryant also testified that later in the evening she had asked the defendant if the victim had been killed over drugs or money and that he had replied, "No, [it] wasn't about drugs and it wasn't about any money." She had then asked what it was about and he replied, "I'm too upset. I can't talk. I'll come back tomorrow and tell you." Bryant testified that the defendant had not later explained why the victim had been shot, but did deny shooting him.

Jonathan Hughes testified that he had been sitting on a car parked along B Street when he saw the victim walking down the sidewalk. Hughes testified that the defendant had been walking down the street behind the victim, telling him to "Come here and let me holler at you for a minute." Hughes testified

that the victim had responded that he didn't have time, he was looking for his money. According to Hughes, the defendant had continued to follow the victim. Paul Ray Jones, Hughes' cousin, testified that he had been with Hughes and had also seen the defendant and the victim walking down the street.

Hughes testified that Jones had then told him that his girlfriend, Melissa Gooch, wanted to talk to him. At this, Hughes had started down B Street to meet his girlfriend, walking on the opposite sidewalk and somewhat behind the victim and the defendant, but going in the same direction. A short distance later, where B Street intersected A Street, Hughes testified that he and his girlfriend had turned left while the defendant and the victim turned right. He further testified that he and Gooch had then heard two shots, at which they had turned around, looked up A Street, and saw the defendant fire two shots at the victim. Hughes testified that he had then seen the defendant bend down, roll the victim over, and run around the far corner of the building. Hughes testified that he had then gone to where the victim was lying, arriving there after ten or fifteen others had.

Two other witnesses testified that they had seen the defendant running at some distance from the body, but in a direction away from the body, and that he had been trying to hide his face behind his jacket. These sightings were immediately after the shooting, at about 12:30 a.m. The defendant denied taking any such actions.

Melissa Gooch was not called to testify by either the defendant or the State.

The defendant denied shooting the victim. He testified that he and the victim had not had an argument that night and that the victim was trying to

sell some cocaine. He testified that he had brought a small amount of cocaine to the party as a gift to the host and hostess, but that the victim had wanted to add it to some cocaine he already had and sell the entire amount to a third party. The defendant testified that he had been agreeable to this so long as the victim repaid him a previous ten dollar ($10) loan out of the proceeds. The victim was reluctant to do this because he needed the money for his car.

The defendant testified that he had left the party because two of the three newcomers had "appeared to be gangster[s]," so he had gone to his pickup truck to get his pistol for protection. [FN 3: The pistol that the defendant had and which was recovered by the police during a consensual search was not the murder weapon.] On the way back to the apartment from his truck, the defendant testified, he had met the same three men who then told him that the victim had been shot. At that point, the defendant testified, he had walked down to the murder scene, hiding his pistol under a fence on the way. The defendant denied that he had been on the street where Hughes claimed to have seen him.

Freddie Davis testified that he had been walking from his mother's apartment to his sister's apartment when he saw the victim and someone else he couldn't identify walk up to a brown and beige car on A Street. Davis testified that "they was talking for a minute and then the next thing I know the dude just come out of his car and just started shooting." Davis testified that he had then run to his sister's apartment to tell her, and had then gone down to where the victim was lying. The angle of Mr. Davis' view was approximately perpendicular to that of Hughes but, from a review of the exhibits, the jury could

reasonably have concluded that the distance of each witness from the scene of the shooting was roughly about the same. Davis testified that the car had taken off and that he was with the victim when he died. Davis also testified that "everybody [had been] saying that Frankenberry had shot" the victim. Davis reported this information to the police, who then put a "pick-up" out on the vehicle. Detective Wynn testified that they had investigated a car that matched the description given and had tried to develop information on a Frankenberry, but that they had not come up with any other indication that Frankenberry had been involved, and had not tied the vehicle to the crime.

Davis also testified that he had not seen Jonathan Hughes at the scene and that the other person who had been with the victim when he was shot had run off. Davis testified that this person had been wearing blue jeans and a gray jacket. The defendant had been wearing red pants on the night in question. Davis admitted on cross examination that he had drunk two to four half-pints that night prior to the shooting.

The victim had been shot with a .25 caliber gun and three .25 caliber bullets were recovered from his body. The murder weapon was never found. However, John Crawford testified that he had seen the defendant pull a pistol out from under a car seat nine to ten months before the shooting and that, although he could only see a portion of the pistol because the defendant had had it "cuffed up," he thought it was a .25 caliber pistol. Terry Merrill testified that, after the shooting, he had seen the defendant retrieve a gun from under a fence between two buildings and put it in his pants. The defendant testified that this had been the .22 caliber pistol

that he had hidden after learning of the victim's death. The defendant testified that he had never had a .25 caliber gun. *Jackson v. State,* No. 01–C–01–9412–CR–00427, 1995 WL 747843, at \*1–\*4 (Tenn. Crim.App. Dec.19, 1995).

When interviewed by investigators in 1994, Gooch provided a sworn statement that, contrary to Hughes testimony, she was not with Hughes on February 2, 1986 and did not see Jackson shoot Crawley. (J.A. at 35.)

## B. Procedural Background

On August 25, 1987, Jackson filed a notice of appeal from his criminal conviction, but the appeal was dismissed in May 1988 at the request of Jackson and his counsel. (Final Brief of Appellee, p. 4; Final Brief of Appellant, p. 3.) Ten months later, in March 1989, Jackson filed a petition for postconviction relief alleging ineffective assistance of counsel. Specifically, Jackson argued that his trial counsel was ineffective because he (1) failed to interview several witnesses prior to trial, (2) waived Jackson's preliminary hearing, (3) failed to file a request for discovery and inspection, (4) failed to discover an investigating officer's report containing information about another suspect, (5) failed to request *Jencks* material after the state's witnesses testified, (6) failed to prepare Jackson for his testimony, and (7) failed to effectively cross examine the state witnesses. *Jackson,* 1995 WL 747843, at \*8.

Jackson's trial counsel, Doug Love, testified at a hearing in July 1990. In February 1991, Jackson filed an "Amendment to Petition for Postconviction Relief." Additional evidence was presented at a hearing in May 1991, at which Love, Jackson, Detective Terry McElroy, Jonathan Hughes, Sharon Bryant, and Ethel Robertson testified.

The Tennessee Court of Criminal Appeals summarized the evidence presented as follows:

Mr. Love testified that he had been licensed to practice in the State of Tennessee in 1979 and that he had been practicing primarily criminal law in this state since that time. The defendant hired Mr. Love to represent him in the trial of this matter. Mr. Love testified that he had met with the defendant in his office "at least a half a dozen" times, discussing matters for fifteen to thirty minutes on each occasion. Mr. Love also went out with the defendant to University Court at least twice where Mr. Love viewed the relevant area and drew two diagrams. The defendant told Mr. Love the names of several witnesses, which Mr. Love wrote down, including Freddie Davis and Sharon Bryant. Although the record is clear that Mr. Love spoke with Davis prior to the trial, it is unclear whether he spoke with Bryant. Mr. Love also testified that he and the defendant had discussed the defendant's own testimony and the nature of anticipated cross-examination, although they did not go through a "formal rehearsal." Mr. Love testified that he had felt adequately prepared when they went to trial.

Mr. Love explained that he had not filed a request for discovery and inspection because he had discussed the case with the State's attorney at least twice and had had an opportunity to review the State's file which, apparently, contained transcripts of the statements made to the police by Hughes, Bryant, Mark Crawford and Bryant's sister. Although he admitted that he had not spoken with Hughes prior to the trial, he testified that he felt that he had gotten what information he needed about Hughes' anticipated testimony from the State.

Although Mr. Love could not remember specifically why the preliminary hearing was not had in this matter, he testified that he assumed it had been waived to get a favorable bond reduction, and that he thought there were ways other than a preliminary hearing to "get the information necessary to try a case." There is no proof in the record that Mr. Love would have obtained information at the preliminary hearing that he could have used to the defendant's advantage at trial. *Jackson*, 1995 WL 747843, at \*8–\*9.

Jackson presented additional evidence in support of his claim. He argued that the issue of bond was never raised and that the face of the arrest warrant did not support Love's supposition about why he waived the preliminary hearing. Love explained that he did not request discovery because he was relying on a conversation with the prosecutor and was able to review the prosecutor's file; Jackson argued that Love did not even take notes when reviewing these files. None of the state witnesses recalled speaking with Love, and Love did not recall interviewing any of them. Love was on vacation for the four days before the start of Jackson's trial and apparently acting under the mistaken impression that the trial would be continued. Finally, Love never requested available *Jencks* material. (J.A. at 57.)

In July 1994, the Tennessee lower court denied Mr. Jackson's petition for postconviction relief. *Jackson*, 1995 WL 747843, at \*5. The court found "as a matter of law that any arguable deficiency on the part of Mr. Love would not have resulted in a different outcome in this case." *Id.* On August 8, 1994, Mr. Jackson filed a Motion for Hearing in the Nature of a Motion for a New Trial, alleging that newly discover-

ed evidence, specifically Ms. Gooch's testimony, required an evidentiary hearing and a reopening of the proof. *Id.* The lower court summarily denied this motion.

Simultaneous with his Motion for Hearing in the Nature of a Motion for a New Trial, Jackson also appealed the lower court's decision to the Tennessee Court of Criminal Appeals. The state appellate court affirmed the lower court's decision on December 19, 1995. The appellate court determined that the lower court had properly exercised its discretion in refusing to reopen the proof to consider Gooch's testimony. *Id.* at \*5–\*6. In affirming the lower court decision, the appellate court considered the fact that Jackson had already filed a motion for new trial and that he knew Gooch's name at the time of the trial. *Id.* at \*6. With regard to Jackson's ineffective assistance of counsel claim, the court never squarely addressed the question of whether Love's performance was ineffective, but based its decision on the determination that Jackson was unable to establish prejudice. *Id.* at \*9–\*10.

Following the Tennessee Court of Criminal Appeals's affirmance of the lower court's ruling, Jackson applied for permission to appeal, which the Tennessee Supreme court denied on June 10, 1996.[1]

On April 23, 1997, Jackson filed a *pro se* petition for federal habeas relief. The district court appointed the Federal Public Defender to represent Jackson, who requested that Jackson's petition be held in abeyance while he exhausted state remedies. (J.A. at 61.)

Once the case was reopened, Holland moved to dismiss portions of Jackson's ineffective assistance of counsel claim and moved for summary judgment. (J.A. at

---

1. Jackson also filed a second petition for postconviction relief in the state court that has no bearing on the ineffective assistance of counsel claim.

3.) The district court denied the motion to dismiss, but granted the motion for summary judgment. Although the court believed that Jackson's trial counsel was ineffective and that Jackson had been prejudiced by his counsel's ineffectiveness, the district court determined that the restrictions of 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA"), precluded it from granting relief. (J.A. at 67.) Specifically, the district court found that the Tennessee court correctly identified *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as the governing law (J.A. at 67) and reasonably applied it to Jackson's claim. (J.A. at 73.)

Finding that "the evaluation of unreasonableness under 28 U.S.C. § 2254(d)(1) is debatable among reasonable jurists," the district court issued Jackson a certificate of appealability with regard to whether the state court unreasonably applied *Strickland* to Jackson's claim of ineffectiveness. (J.A. at 89.)

## STANDARD OF REVIEW

This court reviews the district court's disposition of a petition for habeas corpus *de novo*. *See Cook v. Stegall*, 295 F.3d 517, 519 (6th Cir.2002). The district court's factual findings, however, are reviewed for clear error. *See id.*

The court's review of Mr. Jackson's § 2254 petition is governed by Chapter 153 of AEDPA. Under this statute, a federal court reviewing a state prisoner's petition for a writ of habeas corpus under 28 U.S.C. § 2254 must first determine whether a constitutional right has been violated. *See Williams v. Taylor*, 529 U.S. 362, 367, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). If the answer is in the affirmative and the state court adjudicated the claim

on its merits, this Court must then employ the new standard of review set forth in 28 U.S.C. § 2254(d) to determine whether to grant a writ of habeas corpus. *Williams*, 529 U.S. at 367, 402–403, 412–413. As amended by Chapter 153 of AEDPA, § 2254(d) provides as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) Resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d)(1), the Court may grant the writ "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–413. Under the "unreasonable application" clause of § 2254(d)(1), the Court may grant the writ "if the state court identifies the correct governing principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. To meet this standard, the state court's application of clearly established federal law must be more than incorrect or even clearly erroneous, it must be objectively unreasonable. *Lockyer v. Andrade*,

538 U.S. 63, 123 S.Ct. 1166, 1174–75, 155 L.Ed.2d 144 (2003). Though the Supreme Court has not yet interpreted the "unreasonable determination" clause of § 2254(d)(2), based upon the reasoning in *Williams*, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding. *Accord Torres v. Prunty*, 223 F.3d 1103, 1107–08 (9th Cir.2000) (determining that "unreasonable" in § 2254(d)(1) had same meaning as "unreasonable" in § 2254(d)(2)). In substance, § 2254(d), as amended by Chapter 153 of AEDPA, places a new constraint on the power of the Court to grant Jackson's application for a writ of habeas corpus as to constitutional claims adjudicated on the merits in the state court. *Williams*, 529 U.S. at 412.

## DISCUSSION

### A. Clearly Established Supreme Court Precedent

The merits of Mr. Jackson's claim of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), under principles that are "clearly established" for purposes of 28 U.S.C. § 2254(d). *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under *Strickland*, a criminal defendant must satisfy two requirements in order to succeed on his claim of constitutionally ineffective assistance of counsel. First, the defendant must demonstrate that his counsel's performance was so deficient that it "fell below an objective standard of reasonableness," such that his attorneys were not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. Second, the defendant must demonstrate that his attor-

ney's deficient performance prejudiced his defense. *Id.* at 687, 104 S.Ct. 2052. Both deficient performance and prejudice must be shown before a defendant's conviction becomes so constitutionally suspect that it must be overturned. *Bell v. Cone*, 535 U.S. 685, 695, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citing *Strickland*, 466 U.S. at 687); *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir.2001).

In evaluating a criminal defendant's claim of objectively unreasonable behavior by his attorney,

> a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and make all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 690. "The court also must not indulge in hindsight, but evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors." *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir.1996). Tactical decisions of trial counsel "are particularly difficult to

attack, and a defendant's challenge to such decisions must overcome a presumption that the challenged action might be considered sound trial strategy." *Id.* (quotation marks and citations omitted). However, a court reviewing an ineffective assistance claim "must make an independent judicial evaluation of counsel's performance" to "ensure that counsel acted reasonably under all the circumstances." *Id.*

■ Because the performance of Mr. Jackson's attorney must be measured for reasonableness under prevailing professional norms, trial counsel was bound by a standard of care applicable when this case was tried in 1987 in Davidson County, Tennessee. The district court found this standard to be articulated in *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975)—a conclusion that neither party has disputed. In *Baxter*, the Tennessee Supreme Court adopted as a measure of competency the Sixth Circuit's requirement that defense counsel perform at least as well as a lawyer with ordinary training and skill in criminal law; conscientiously protect his client's interest, undeflected by conflicting considerations; and investigate all apparently substantial defenses available to the defendant and assert them in a proper and timely manner. *Id.* at 934–35 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir.1974)); *see also id.* at 936. Directly relevant to the present case, *Baxter* adopted the more specific duties set forth

in *United States v. DeCoster*, 487 F.2d 1197 (D.C.Cir.1973):

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. [T]he adversary system requires that all available defenses are raised so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, or course, the duty to investigate also requires adequate legal research.

*Baxter*, 523 S.W.2d at 933 (quoting *DeCoster*, 487 F.2d at 1203–04) (internal quotation marks omitted); *see also id.* at 936.

■ Against this backdrop of professional duties, it is not difficult to conclude that Mr. Love rendered deficient assistance that fell below an objective standard of reasonableness. At the very least, Love failed to impeach many of the State's witnesses with prior inconsistent statements to police,[2] and failed to adequately interview potential witnesses, including Walter Ezell, who described to police seeing a black man with a brown jacket and brown pants get into a brown car that sped away just after the shooting (Addendum 6), and

---

2. Jonathan Hughes twice recounted seeing a brown Lincoln driving at a high rate of speed on the night of the shooting in separate statements to the police (Addendum 2 at 2; Addendum 3 at 1), yet testified at trial that he had seen no such vehicle (Tr. I at 70). Mark Crawford at trial described walking with Steve Crawley when the two saw Mr. Jackson run through a fence away from the shooting and toward his sister's house (Tr. I at 58–62), but previously told police that he had been standing with Jonathan Hughes and Steve

Crawley when James Crawley was shot (Addendum 4 at 2). Paul Ray Jones testified at trial that he saw Jackson and Crawley walking together just before Crawley was shot, that he left for home and Hughes left to see his girlfriend just before the shooting, and that he heard no shots. (Tr. II at 7–9.) To the police, however, Jones said that he, Jonathan Hughes, and Eddie McKissack heard three "real loud" shots and ran up the street to seek Crawley lying on the ground. (Addendum 8.)

Melissa Gooch,[3] who denied being with Hughes or seeing Crawley's murder. While defense counsel is not subject to an absolute duty to investigate particular facts or a particular line of defense, *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir.2000) (en banc); *see Strickland*, 466 U.S. at 688–90, Mr. Love's conduct in this instance was objectively unreasonable.

■ As stated *supra*, however, this does not end the inquiry under *Strickland's* two-pronged system. Instead, Jackson still must prove "prejudice" under *Strickland's* second prong to establish a constitutional violation. "Prejudice" under the second prong may be either actual or presumed. Prejudice is presumed only where there has been actual or constructive denial of the assistance of counsel, where there has been state interference with counsel's assistance, where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), or where defense counsel "actively represented conflicting interests" and that "actual conflict of interest adversely affected his ... performance." *Strickland*, 466 U.S. at 692; *accord Bell v. Cone*, 535 U.S. 685, 695–96, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *see also Mickens*, 535 U.S. 162, 122 S.Ct. at 1240–41, 152 L.Ed.2d 291 (prejudice need not be shown "where assistance of counsel has been denied entirely or during a critical stage of the proceeding"). In all other instances, a defendant seeking to satisfy

*Strickland's* second prong must demonstrate actual prejudice by "show[ing] that there is a reasonable probability[4] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (footnote added). In other words, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Both deficient performance and prejudice (whether actual or presumed) must be shown before a defendant's conviction becomes so constitutionally suspect that it must be overturned. *Bell*, 535 U.S. at 695 (citing *Strickland*, 466 U.S. at 687); *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir.2001).

The evidence at Jackson's trial, at the postconviction hearing, and in Melissa Gooch's statement essentially reveals two competing versions of events. In the version advanced by Petitioner, he and James Crawley never argued and Jackson left the party to get his .22 caliber weapon for protection from the three "gangsters." As he headed back to the party, Jackson encountered these three individuals, who told him that Crawley had been shot. The four then headed toward the scene of the shooting, with Jackson leading the other three through a fence, where he dropped off his .22 caliber pistol. When the four arrived at the scene, Steve Crawley, Mark Craw-

---

3. When evaluating Jackson's contention that the lower court erred by refusing to reopen the proof to allow Melissa Gooch to testify, the Tennessee Court of Criminal Appeals held that as a matter of state law Jackson's failure to timely present Ms. Gooch as a witness justified the lower court's refusal. *Jackson*, 1995 WL 747843, at *5–*6. The Tennessee appellate court did not, however, employ this rationale to reject Jackson's ineffective assistance of counsel argument. *Id.* at *8–*10.

Accordingly, the "adequate and independent state ground" rule of *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), is inapplicable to Jackson's ineffective assistance of counsel claim.

4. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

ford, Stephanie,[5] Freddie Davis, and Sharon Bryant were already there. Staying until the ambulance arrived, Jackson then went to his sister's house, stopping on the way to pick up his gun.

In the version of events advanced by the State, Jackson and James Crawley got into an argument over drugs, Jackson followed Crawley outside, and eventually shot him. After shooting Crawley, Petitioner fled towards his sister's house. A few minutes later, Jackson returned to the scene of the shooting where he muttered a confession to Sharon Bryant.

Jonathan Hughes was unquestionably the State's most important witness against Jackson. His testimony not only placed Jackson at the scene, but affirmatively made him the shooter. Absent Hughes's testimony, the State could produce no eyewitness who actually saw Jackson shoot Mr. Crawley. The only other significant witness testimony supporting the State's theory of the case was Steve Crawley and Mark Crawford's trial description of seeing Petitioner running from the scene, John Crawford's testimony that he'd seen Petitioner 9–10 months prior with a .25 caliber handgun, and Sharon Bryant's testimony of Jackson's muttered confession and his prior argument with James Crawley. Other than this witness testimony, no physical evidence linked Petitioner to the crime.

Conversely, Jackson's version of events was supported by his own testimony, as well as the testimony of Freddie Davis, who claimed to have seen someone else shoot James Crawley, and Detective Terry McElroy, who memorialized Davis's statement after the shooting.

Had Mr. Love fulfilled his duties as Jackson's advocate, Jackson would have been able to impeach Hughes's account with Melissa Gooch's testimony, as well as with Hughes's prior statement to police about seeing a brown Lincoln. Petitioner could have buttressed Freddie Davis's story with Walter Ezell's similar recollection. He also could have called into question Hughes's account by contrasting it with Mark Crawford's February 5 recollection to the police of standing with Hughes when Crawley was shot and with Jones's statement to the police that he, Hughes and Eddie McKissack had heard three "real loud" shots and had run up the street to see Crawley lying on the ground.

In light of the weak proof supporting the State's case against Petitioner and the number of conflicting accounts of events, we concur with the district court that Mr. Jackson has satisfied the prejudice prong. Petitioner has presented sufficient evidence to demonstrate a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.

## B. Unreasonable Application of *Strickland*

■ As the previous discussion reveals, the Tennessee Court of Criminal Appeals rendered a decision in Mr. Jackson's state collateral attack proceeding that was based on an incorrect application of clearly established federal law. For Mr. Jackson to be entitled to relief, however, he must meet the elevated burden of § 2254(d)(1) by showing that the decision involved an unreasonable application of, or is clearly contrary to, that clearly established federal law.

---

5. It is unclear from the record precisely who "Stephanie" is, although it appears that she might be a cousin of the victim.

Mr. Jackson first argues that the state court decision involved an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As explained by the Supreme Court in *Williams v. Taylor*, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, even a state court's clearly erroneous application of federal law will not justify relief under this prong of § 2254(d)(1) unless it is also objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 1174–75, 155 L.Ed.2d 144 (2003).

In support of his argument, Jackson points to the fact that the state court decision is inherently inconsistent. The Tennessee Court of Criminal Appeals noted that "the case against the defendant hinged on whether the jury chose to believe Hughes' account of who shot the victim (which was bolstered by two witnesses who claimed to have seen the defendant running from the scene), or the defendant's and Davis' accounts." *Jackson v. State*, 1995 WL 747843, at *10. At the same time, the court dismissed the notion that evidence indicating Gooch was not with Hughes on the night of the murder would have affected the outcome of the trial, reasoning that "it in no way rises to the level of contradicting what Hughes claims to have seen." *Id.* at *9. In other words, despite recognizing the importance of Hughes's testimony to the State's case, the court concluded that the impeachment evidence was insubstantial because it did not discredit Hughes's testimony with regard to the shooting. Petitioner argues that any impeachment evidence, regardless of whether it went to the shooting itself, could have convinced the jury to credit the testimony of Davis and Jackson over the testimony of Hughes.

At trial, Hughes testified that on the night of the shooting, while he was sitting on a car with Ray Jones, he saw Crawley walking down the street and Jackson trying to talk with him. Jones then told Hughes, according to Hughes's testimony, that his girlfriend, Gooch, wanted to talk to him. Hughes testified that he left Jones to meet Gooch down the street. According to his testimony, he was with her when they both heard gunshots and both turned around to see Jackson shooting Crawley. *Id.* at *2. Gooch, however, provided a sworn statement that she was not with Hughes that night and was uncertain as to why he would have testified as he did. (J.A. at 35.)

Our analysis of the record in this case convinces us that the state courts' finding that Mr. Jackson was not prejudiced by his counsel's performance is objectively unreasonable. Conceding only that Gooch's account of events "might have affected Hughes' credibility in some minimum way," *Jackson*, 1995 WL 747843, at *9, the Tennessee Court of Criminal Appeals recognized only two possible effects that Gooch's account might have had upon the jury: (1) that the jury would have disbelieved Gooch entirely and still fully credited Hughes's testimony; and (2) that the jury would conclude that Hughes had accurately remembered seeing Jackson shoot Crawley but had mistakenly recounted that Gooch had been with him. The court ignored entirely the equally plausible inference that Hughes was not testifying truthfully or was unable to accurately recall the event. Although the court was correct in stating that Gooch's statement does not directly contradict what Hughes claims to have seen, direct contradiction is not a prerequisite for relief under *Strickland*. The proof on both sides consisted entirely of eyewitness testimony and circumstantial evidence, which made the case essentially a battle of witness credibility.

The Tennessee Court of Criminal Appeals applied *Strickland* in an objectively unreasonable manner by holding that Gooch's statement—which, if believed, casts serious doubt upon State star witness Hughes's account of events—did not establish a reasonable probability that, but for Love's failure to interview Gooch prior to trial, a juror would have found that the State had failed to meet its burden of proof. In short, given the State's lack of physical evidence, the importance of Hughes's testimony to the State's case against Mr. Jackson, and the potential effect Gooch's statement could have had with the jury, it was objectively unreasonable for the Tennessee Court of Criminal Appeals to conclude as it did.

### C. "Contrary To" *Strickland*

#### 1. Presentation to the District Court

 Petitioner next argues that the state court decision was contrary to the Supreme Court's *Strickland* decision. Holland responds that this court should not consider Jackson's "contrary to" claim because Jackson failed to present it to the district court. In his petition and amended petition, Jackson argued that his counsel had been ineffective without ever mentioning the § 2254(d) standards. The first mention of the § 2254(d) standards in the record before us comes in the district court's summary judgment decision, which rested solely upon the "unreasonable application" prong of § 2254(d)(1). In turn, ⸱⸱ꞏner discussed § 2254(d)(1)'s "unreasonable application" prong when seeking a certificate of appealability from the district court without ever referencing the "contrary to" prong. Mr. Jackson later asked this court to expand the certificate of appealability to include three additional claims, but again failed to mention the "contrary to" prong of § 2254(d)(1). Apparently, the first reference to the "con-

trary to" prong in this case came in Jackson's brief. (*See* Final Brief of Appellant at 17–20.)

"Ordinarily, the courts of appeals do not consider claims or arguments that were not raised in the district court." *United States v. Hayes,* 218 F.3d 615, 619 (6th Cir.2000). Nonetheless, this court does not adhere to this practice in " 'exceptional cases or particular circumstances' or when the rule would produce 'a plain miscarriage of justice.' " *Pinney Dock and Transport Co. v. Penn Central Corp.,* 838 F.2d 1445, 1461 (6th Cir.1988) (quoting *Hormel v. Helvering,* 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)). "[T]o the extent the issue is presented with sufficient clarity and completeness and its resolution will materially advance the … litigation," the court of appeals should consider the claim. *Pinney,* 838 F.2d at 1461.

In the present case, Jackson did not discuss any of the § 2254(d) standards when seeking relief in federal district court, and his only references to that subsection's "unreasonable application" prong came in response to the district court's use of the prong. Before that, Jackson simply argued that his trial counsel had been constitutionally infirm. Under these circumstances, and because Jackson's claim that the state court's decision was "contrary to" *Strickland* is fully before this court (*see* Final Brief of Appellant at 17–20; Final Brief of Appellee at 19–20; Final Reply Brief of Appellant at 4–6) and important to the just resolution of this case, we exercise our discretion and consider Jackson's "contrary to" argument.

#### 2. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253, an appeal may not be taken to this court absent a certificate of appealability ("COA"). 28 U.S.C. § 2253(c); Fed. R.App. P. 22(b). The COA should issue only if the petition-

er has made "a substantial showing of the denial of a constitutional right" and should specify which issues satisfy this requirement. 28 U.S.C. §§ 2253(c)(2) and (3).

The district court issued the COA with regard to only the unreasonable application prong of 28 U.S.C. § 2254(d)(1). (J.A. at 89.) As previously discussed, Petitioner asked this court to expand the district court's COA to include other claims (a request which we denied), but did not seek that the COA be expanded to include a "contrary to" claim. Notwithstanding these prior omissions, both parties addressed Petitioner's "contrary to" claim in their briefs. (Final Brief of Appellant at 17–20; Final Brief of Appellee at 19–20; Final Reply Brief of Appellant at 4–6.)

A court of appeals has both the power to grant a certificate of appealability where the district court has denied it entirely and the power to expand a district court's grant of a certificate of appealability to include additional issues. *Valerio v. Crawford*, 306 F.3d 742, 763–64 (9th Cir.2002) (en banc). This power can be invoked in response to a party's specific request for expansion or merely when a party includes in his brief issues that were not specified in the certificate. *Rittenhouse v. Battles*, 263 F.3d 689, 693 (7th Cir.2001); *see Kincade v. Sparkman*, 117 F.3d 949 (6th Cir. 1997) (construing notice of appeal as request to expand certificate of appealability). Thus, we imply from Jackson's inclusion of the "contrary to" argument in his brief a request to expand the certificate of appealability to include this issue.

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Under this standard, a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter,

agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)). The certificate of appealability determination "requires an overview of the claims in the habeas petition and a general assessment of their merit" but "does not require a showing that the appeal will succeed." *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003). This means that the petitioner need not prove "that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that the petitioner will not prevail." *Id.* at 1040. In this manner, the COA inquiry is a separate proceeding that is independent of and distinct from the underlying merits. *Id.* at 1042.

In the instant case, Petitioner has met the COA requirements. Petitioner's claim that the state court's decision was contrary to clearly established federal law arises from the burden of proof articulated in *Strickland v. Washington*. As noted above, *Strickland* requires that a defendant establish a reasonable probability of prejudice. *Id.* at 694. The *Strickland* court described a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* This standard is less demanding than a preponderance of evidence standard. *See Williams v. Taylor*, 529 U.S. 362, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (noting that imposition of preponderance standard in establishing prejudice would be contrary to *Strickland*); *Miller v. Straub*, 299 F.3d 570, 581 (6th Cir.2002); *Magana v. Hof-*

*bauer*, 263 F.3d 542, 550 (6th Cir.2001); *Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir.2000); *see also Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir.2001) (noting that "[t]his standard is 'not a stringent one' ").

Mr. Jackson contends that the Tennessee Court of Criminal Appeals applied an incorrect burden of proof in assessing the prejudice component of his claim. Although the court initially quoted the "reasonable probability" language of *Strickland*, it immediately followed this statement with language that "[i]n a post-conviction proceeding, the defendant has the burden of proving his allegations by a preponderance of the evidence." *Jackson v. State*, 1995 WL 747843, at *9. The court later stated "it is asking too much that we draw the inference that the jury *would not have believed* Hughes at all had Melissa Gooch testified." *Jackson v. State*, 1995 WL 747843, at *9 (emphasis added). Furthermore, the state court concluded that Jackson "failed to carry his burden of proving that the outcome of the trial *would probably have been different* but for those errors." *Id.* at *10 (emphasis added).[6] According to Mr. Jackson, this language establishes that the state court shouldered him with an improperly heavy burden. This heavy burden, he avers, is contrary to the Supreme Court's holding in *Strickland*. *See Magana*, 263 F.3d at 550 (holding burden of absolute certainty is contrary to *Strickland* ).

In *Williams v. Taylor*, the Supreme Court hypothesized about the effect of employing an incorrect burden of proof:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

*Williams*, 529 U.S. at 405–406 (quoting *Strickland*, 466 U.S. at 694).

In light of this precedent, we are convinced that Petitioner has sufficiently established for COA purposes that his claim is debatable. The Tennessee Court of Criminal Appeals's various descriptions of Mr. Jackson's burden—"the jury *would not have believed* Hughes at all," *Jackson*, 1995 WL 747843, at *9 (emphasis added), "burden of proving that the outcome of the trial *would probably have been different* but for those errors," *id.* at *10 (emphasis added)—are sufficiently dissimilar to the correct "reasonable probability" standard of *Strickland* and sufficiently similar to the incorrect standard of *Williams*—"a preponderance of the evidence that the result of his criminal proceeding *would have been* different," *Williams*, 529 U.S. at 405–406 (emphasis added)—to spark debate among reasonable jurists. Petitioner is therefore entitled to a COA on his "contrary to" claim, and we will expand the district court's COA grant to include this claim.

### 3. The Merits of the "Contrary To" Claim

■ Although Mr. Jackson's claim is sufficiently debatable to justify a COA

---

6. In evaluating Mr. Jackson's contention that the lower court should have reopened the proof in the collateral proceeding to allow Melissa Gooch to testify, the Tennessee Court of Appeals also stated that Gooch's statement "does not lead to the conclusion that the jury *would have decided the case differently* had it heard Gooch testify." *Id.* at *6 (emphasis added).

grant, the inquiry does not end there. *See Miller–El*, 123 S.Ct. at 1040, 1042 (claim may be debatable even though all jurists would agree, after full consideration, that claim must fail; COA inquiry is separate and distinct from the underlying merits). Before relief may be granted under § 2254(d)(1)'s "contrary to" prong, Petitioner must establish that the state court arrived at a legal conclusion opposite to that reached by the Supreme Court or that the state court decided his case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 412–13.

The Supreme Court, in *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam), recently addressed a factual scenario similar to the case at bar. There, John Visciotti was convicted by a California jury of first-degree murder, attempted murder, and armed robbery. *Id.*, 123 S.Ct. at 358. The same jury sentenced Visciotti to death. *Id.* After exhausting his direct appeal, Visciotti levied a collateral attack in the California Supreme Court. *Id.*

The California Supreme Court denied Visciotti's petition, finding that Visciotti had not been prejudiced by his counsel's alleged deficient performance. *Id.* (citing *In re Visciotti*, 14 Cal.4th 325, 58 Cal. Rptr.2d 801, 926 P.2d 987, 1004, 1006 (Cal. 1996)). In denying Visciotti's petition, the state court began its analysis of Visciotti's ineffective assistance of counsel claim with the "reasonable probability" criterion from *Strickland*, then stating that "[t]he question we must answer is whether there is a reasonable probability that, but for counsel's errors and omissions, the sentencing authority would have found that the balance of aggravating and mitigating factors did not warrant imposition of the death penalty" and again citing *Strickland*. *Id.* (citing *In re Visciotti*, 58 Cal.Rptr.2d 801,

926 P.2d at 1003). Later, the California Supreme Court asked, "Is it reasonably probable that the jury would have reached a more favorable penalty phase verdict had [Visciotti's attorney] represented him with greater competence?" *In re Visciotti*, 58 Cal.Rptr.2d 801, 926 P.2d at 1004. The court also discussed the need to assess whether the attorney's performance "undermine[d] confidence" in the trial's outcome, *id.*—language that tracks *Strickland's* description of the "reasonable probability" standard. *Woodford*, 123 S.Ct. at 359 (citing *Strickland*, 466 U.S. at 694). Despite these references to *Strickland* and the reasonable probability standard, the California high court on four occasions employed the term "probable" without the modifier "reasonably." *Id.*

Visciotti then brought a § 2254 challenge to his conviction and sentence in federal court. The California district court granted Visciotti relief and the Ninth Circuit affirmed. *Id.* at 358. Both courts' decisions found that the California court's use of the word "probable" to describe the prejudice standard was contrary to the burden of *Strickland*. The Supreme Court, however, reversed:

> The California Supreme Court's opinion painstakingly describes the *Strickland* standard. Its occasional shorthand reference to that standard by use of the term "probable" without the modifier may perhaps be imprecise, but if so it can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision. *See Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1241, 152 L.Ed.2d 291 (2002) ("probable effect upon the outcome"); *Williams v. Taylor*, 529 U.S. 362, 393, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("probably affected the outcome").

The Court of Appeals made no effort to reconcile the state court's use of the term "probable" with its use, elsewhere, of *Strickland's* term "reasonably probable," nor did it even acknowledge, much less discuss, the California Supreme Court's proper framing of the question as whether the evidence "undermines confidence" in the outcome of the sentencing proceeding. This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law.... It is also incompatible with § 2254(d)'s "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), which demands that state court decisions be given the benefit of the doubt.

*Id.* at 360 (string citation omitted).

Here, the Tennessee Court of Criminal Appeals, like the state court in *Visciotti*, articulated the correct prejudice standard from *Strickland. Compare Jackson*, 1995 WL 747843, at *9, *with In re Visciotti*, 58 Cal.Rptr.2d 801, 926 P.2d at 1003. But unlike the California Supreme Court's decision in *Visciotti*, the state court decision at issue here made no further reference to *Strickland* or to its prejudice standard. *Compare Jackson*, 1995 WL 747843, at *9–10, *with In re Visciotti*, 58 Cal.Rptr.2d 801, 926 P.2d at 1003–06. Instead, the Tennessee appellate court repeatedly referenced a "preponderance of the evidence"-like standard in examining whether Jackson had been prejudiced by his counsel's performance. *Jackson*, 1995 WL 747843, at *9, *10.

Even keeping mindful of the deferential gaze that we must cast upon the Tennessee Court of Criminal Appeals's decision, *see Woodford*, 123 S.Ct. at 360, we must conclude that the state court merely paid lip service to *Strickland's* reasonable probability standard before imposing an inappropriately stringent burden upon Mr. Jackson. Other than the initial articulation of the *Strickland* standard, there is absolutely no evidence that the state court analyzed Petitioner's claim under the proper "reasonable probability" standard. Indeed, all evidence within the opinion is to the contrary. *See Jackson*, 1995 WL 747843, at *9, *10. A court cannot relieve itself of the duty to apply directly applicable Supreme Court precedent by simply recognizing that that precedent exists. *Cf. Mask v. McGinnis*, 233 F.3d 132, 141 n. 5 (2d Cir.2000) (holding that appellate court's summary recitation of the *Strickland* rule cannot save lower court's inapposite determinations under an incorrect "certainty" standard). Recognition and application are two entirely different actions. Accordingly, the Tennessee Court of Criminal Appeals's act of recognizing the *Strickland* standard while applying a more stringent standard to the case before it requires that we reject the state court's determination as contrary to the rule of *Strickland.*

## CONCLUSION

The district court granted summary judgment in favor of Holland because it determined that the state court decision was neither contrary to nor an unreasonable application of *Strickland.* Because the Tennessee Court of Criminal Appeals both applied a burden of proof contrary to the burden articulated in *Strickland* and unreasonably applied *Strickland's* holding to Jackson's claim, we **REVERSE** the decision of the district court and **REMAND** the case for further proceedings consistent with this opinion.