**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 09a0625n.06**

**No. 07-4466**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Sep 02, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| ROBERT S. VASQUEZ, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Northern |
| MARGARET BRADSHAW, | ) | District of Ohio |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

Before:     MERRITT, BOGGS, and GRIFFIN; Circuit Judges.

        BOGGS, Circuit Judge.  Robert Vasquez, serving a life sentence for the rape of a child under

the age of thirteen, petitioned the district court for a writ of habeas corpus.  He argued that he

received constitutionally ineffective assistance of counsel because his attorney failed to interview

or locate several potential witnesses whose testimony would have cast doubt on the credibility of the

victim, the state's lone witness establishing Vasquez's guilt.  The district court conditionally granted

the writ, holding that the Ohio courts unreasonably applied federal law in denying his ineffective

assistance of counsel claim.  Warden Margaret Bradshaw now appeals from this decision, charging

the district court with failing to accord the state courts deference under the Anti-Terrorism and

Effective Death Penalty Act and with misapplying Sixth Amendment law to the attorney's actions.

While we agree with the warden that the district court improperly disregarded the factual findings

No. 07-4466
Vasquez v. Bradshaw

of the Ohio courts, we affirm the district court's decision. The Ohio courts applied law contrary to

clearly established federal law, stating and applying an overly exacting standard for prejudice as a

result of deficient counsel performance. On our own review of the record, even in light of the state

courts' factual conclusions, we hold that Vasquez received constitutionally ineffective assistance of

counsel and is entitled to habeas relief.

**I**

**A**

Vasquez was tried for the rape and kidnapping of nine-year-old A.L. On direct appeal, the

Ohio courts summarized the facts of the crime, as established by the evidence at trial, as follows:

> On July 23, 2000, the nine-year-old victim and her father [S.L.], who is a Cleveland police officer, went to Don Shaffer's house. Shaffer is the victim's father's best friend. The father and the victim met Shaffer and his fiancee Becky Egbertson [now Becky Shaffer] and Becky's sister, Karra Vasquez, earlier in the evening. They decided that Shaffer would pick up some fast food and they would go to Shaffer's house to eat. The victim's father first returned home to drop off his boat.
>
> By the time the victim and her father arrived at Shaffer's house, it was late and Shaffer and Becky had retired for the night. However, staying with Shaffer was Becky's sister, Karra Vasquez and her husband, the defendant, Robert Vasquez, and their two small children. . . .
>
> After they finished [eating], the victim's father went outside with Kara Vasquez, leaving the victim with Robert Vasquez. Vasquez invited the victim to go downstairs into the basement to watch television and to help him with his two small children. In the basement was a bunk bed. The victim testified that she climbed onto the top bunk and that Vasquez also climbed onto the top bunk after removing the bunk ladder. According to the victim, he then pushed her down with his arm and, while holding his hand over her mouth, he pulled down her pants and underwear and began licking her "private spot." As he was doing this, his two infant children were crawling around on the bottom bunk. He continued the assault until the victim's father called to her from the top of the stairs. The victim then put her clothes back on and went home.
>
> The victim did not say anything about the assault to her father at that time. The next day, the father took the victim and her sister to spend a week with their

grandparents . . . . When the girls returned, the father took them to Shaffer's house to babysit. Sometime later, Robert Vasquez and Don Shaffer returned from work. Robert Vasquez asked the victim several times to go down into the basement with him, but she refused. She then told Don Shaffer that she needed to talk to him. She told Shaffer that Robert Vasquez had sexually assaulted her.

When the victim's father returned, Shaffer informed the victim's father what she had told him. The father called his partner at the police department to request that he come over to the house. He and his partner then talked with his daughter to explain the serious nature of the charges and to assure she was telling the truth. He then called 911. During this entire time, Vasquez remained in the basement until he was arrested later that night.

The victim was taken by ambulance to Metro Hospital where she was interviewed by a social worker and a physical exam was performed.

*State v. Vasquez*, 2001 W.L. 1352781 at *1-*2 (Ohio Ct. App. 2001).

At trial, A.L.'s testimony was the only evidence presented by the state to demonstrate that the crime occurred or that Vasquez committed it. The state also offered testimony from A.L.'s father, Don Shaffer, the investigating police officer, and the social worker who interviewed A.L. Their testimony tended to provide circumstantial evidence of her credibility: that her story remained consistent throughout the investigation and that she acted out of the ordinary, including being fearful for her safety and calling her father daily from school. The defense put on no evidence. Vasquez himself did not testify and no other witnesses were subpoenaed or called. Instead, Vasquez's attorney, Don Butler, pursued a strategy of highlighting the internal inconsistencies in A.L.'s testimony and casting doubt on her truthfulness.

The jury found Vasquez guilty. He was sentenced to life imprisonment for the rape of a minor under the age of thirteen and nine years on the kidnapping charge.

**B**

In addition to his unsuccessful direct appeal, Vasquez filed a petition for post-conviction relief in the Ohio Court of Common Pleas, alleging he received ineffective assistance of counsel. Because the resulting opinion is not clear as to which of its statements were factual findings and which were descriptions of testimony without credibility determinations, we recount the arguments and evidence presented in more detail than a habeas court ordinarily would.

**1**

Vasquez's petition argued, among other things, that his counsel failed to investigate adequately the circumstances surrounding the crime and A.L.'s accusation. This alleged failure resulted in his defense lacking several willing witnesses who could have cast doubt on A.L.'s version of events and on her credibility.

Specifically, Vasquez claimed that Butler, who was assigned to the case by the court after Vasquez's original court-appointed attorney asked to be relieved, never prepared a defense. The two men met only three times prior to the trial. Vasquez alleges that he indicated to his attorney that his wife, Karra Vasquez, and his mother-in-law, JoAnn Kitchen, could provide helpful information but admitted that he did not know where his wife was staying during the trial. Vasquez also claimed that in addition to the face-to-face discussions, he sent Butler two ten-page letters detailing his version of events, but that Butler never mentioned the letters or followed up on the suggestions in them.

Vasquez also argued that Butler failed to locate available evidence and witnesses who would have challenged A.L.'s story and credibility. For instance, the EMS run-sheet produced by the responding EMT on the night that A.L. first accused Vasquez contained statements from A.L. that appear to be at odds with the state's theory of the crime. The run-sheet indicates that she told the

EMT that Vasquez "put it in me" and that she had immediately showered on the night of the assault. At trial, on the other hand, she testified that Vasquez used only his tongue and indicated that she slept through the night on the couch with her father. Vasquez argued that these discrepancies from the initial revelation of the attack would have been a powerful impeachment of her trial story.

Vasquez also identified five witnesses who indicated they would have testified on Vasquez's behalf had Butler approached them. First, Karra Vasquez said that she called Butler twice but never received a return phone call. Vasquez argued that his wife could have testified to facts that would have made the attack less plausible: her presence in the small house, the basement door being open, the relatively short duration that A.L. was in the basement, and A.L.'s undisturbed clothes and normal demeanor upon returning from the basement. She also would have testified to the circumstances related to the accusation, specifically that she overheard A.L.'s father coach A.L. about her story prior to telling the police.

Second, Becky Shaffer also indicated that she had not been contacted by Vasquez's attorney. Vasquez claimed that she had information about the evening of A.L.'s accusation that could cast doubt on its credibility. She rode to the hospital in the ambulance with A.L. that night. She would have testified that A.L. did not appear upset and was excited by the attention, even hoping that her accusation might get her on TV. She also would have testified that A.L.'s father was prompting his daughter's answers.

Third, Vasquez proffered the testimony of JoAnn Kitchen, Karra and Becky's mother. Kitchen had no direct knowledge of the crime or of A.L.'s accusation, but said that she was willing to testify as to A.L.'s truthfulness. As a family friend (in addition to the connection between her son-

in-law Don Shaffer and A.L.'s father, Kitchen was familiar with A.L. and her family because A.L.'s father had dated a third daughter), Kitchen had frequently babysat for A.L. and interacted with her at family events. In her opinion, A.L. craved attention so much that she could not be trusted to tell the truth. Vasquez also argued that Kitchen was important to his ineffectiveness claim because she was the only family member who actually spoke with Butler. She claimed that in her conversation with Butler, she told him that *she* could not help, but denies that she refused Butler access to her daughter or indicated that the family was unwilling to help.

Finally, Vasquez offered two additional witnesses: Tammy Salopek and her daughter, Ashley Snyder. Salopek is a family friend to both A.L.'s family and the Shaffers. Vasquez claimed that she was thus easily identified and located by Butler if he had spoken with Becky Shaffer about mutual acquaintances. Both Salopek and her daughter had extensive social contact with A.L.. They indicated they would have testified to A.L.'s lack of truthfulness – specifically her willingness to lie to get attention. They also could have testified to A.L.'s demeanor immediately after the accusation, as A.L. slept over at Salopek's home the following week. Contrary to the evidence at trial, neither mother or daughter observed any strange or out-of-the-ordinary behavior in A.L.. Further, Vasquez argued that Salopek and her daughter would have provided more substance to a defense theory that A.L. fabricated the story because Ashley Snyder had, earlier in the summer of 2000, been the victim of sexual molestation and had shared her story with A.L.

Together, Vasquez argued that these witnesses demonstrated that his attorney failed to locate evidence and witnesses that could have undermined the plausibility of the case and A.L.'s credibility. Vasquez pointed out that this testimony tended to show that the layout of the house made

the attack unlikely and the fact that she changed her story from the EMS report and received coaching from her father. Moreover, a competent attorney could have put on a defense that explained how a nine-year-old would be familiar enough with sexual assaults to manufacture a story (months earlier she heard details of Ashley Snyder's own sexual molestation) and why she might do so (she has a history of lying for attention; she even hoped to be on TV after accusing Vasquez). Accordingly, Vasquez asked for a new trial.

**2**

The Ohio court held an evidentiary hearing on Vasquez's claims of ineffective representation. The court took testimony from the five witnesses recounted above who supposedly would have participated in Vasquez's defense but for Butler's failure to locate them during his investigation. Vasquez and Butler also testified.

The five witnesses each testified consistently with their affidavits and Vasquez's petition described above, outside of a few concessions on cross examination. (For instance, Becky Shaffer admitted that A.L.'s laughing in the ambulance was in response to the EMT's joking.)

Vasquez testified that prior to trial he had difficulty even learning the identity of his attorney. Once he did discover his attorney's name and contact information, he met with him only three times, and none of those meetings lasted longer than a few minutes and involved little substantive discussion of his case. He asserted that he identified at least his wife and JoAnn Kitchen as people to contact. He repeated that he sent letters to Butler and that claimed that it appeared Butler ignored them, asking basic questions in their meetings that had been answered in the letters.

Butler denied Vasquez's characterization of his defense. He admitted that he met with Vasquez only three times, but argued that he discussed the case at length with his client, but that Vasquez provided no helpful information. When Butler did find Karra Vasquez at her mother's home, he claimed that JoAnn Kitchen refused to speak with him except to indicate that Karra (and the rest of the family) would not help the defense. As to Becky Shaffer, Butler indicated that Don Shaffer's friendship with A.L.'s father and the fact that he was a state's witness made him believe it unlikely that she would help the defense. He also indicated that he did research into child sex abuse cases generally and that he concluded that the best strategy was to attack A.L.'s testimony.

After rehearsing this testimony in detail, the court denied Vasquez's petition. The court explained that "Butler's testimony not only showed no failure in his obligation to prepare the case for trial in general, but specifically concerning the subpoenaing of witnesses, his testimony and of others showed that the defendant's family members refused to cooperate with the defense." *Ibid.* The court continued: "perhaps most importantly, not one of the witnesses who testified . . . offered any testimony that could have changed the outcome of defendant's trial."

Reviewing for abuse of discretion, the Ohio Court of Appeals affirmed the denial of Vasquez's petition. The Supreme Court of Ohio denied discretionary review.

## C

Vasquez filed his petition for a writ of habeas corpus with the district court in June 2005. His listed grounds for relief included, *inter alia*, his assertion that his attorney's limited investigation was unreasonable and therefore denied him effective assistance of counsel.

The district court first acknowledged that it "must generally defer to the factual finding of the state courts," but declined to do so here because "[a] comprehensive review of the 800-plus pages of transcript in the record, in addition to the rest of the documents contained in the record, provides clear and convincing evidence that the facts as found in the Direct Appeal Opinion and Post-conviction Hearing Findings . . . are inaccurate in numerous places." The district court, now feeling freed of its usual deference, thereafter undertook a comprehensive discussion of all of the post-conviction testimony, complete with citations to the record.

Turning to the legal question, the district court concluded that "the state court application of *Strickland* in this case was objectively unreasonable." Specifically, "Butler's performance as a whole was deficient. . . . Butler simply failed in his duty to conduct an objectively reasonable investigation on which to base his conclusions about trial strategy . . . ." The court highlighted Butler's failure to identify or interview several potential defense witnesses and the short amount of attention given directly to Vasquez as evidence of the deficiency. And this "deficient performance prejudiced the defense sufficiently to undermine the reliability of the trial, and thus the state appeals court's findings to the contrary were an objectively unreasonable application of *Strickland*'s prejudice element." Accordingly, the district court granted his petition.

**II**

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244 *et seq.*, requires us, when adjudicating a petition for habeas corpus challenging the legality of a state court conviction, to defer to a final decision on the merits – of fact or law – of the state court that first decided the claims raised. The same Congressionally-supplied standards governed the district

court's consideration of Vasquez's petition and, accordingly, our focus is not on the errors that the warden charges to the district court, but on the state court record and whether it warrants the relief Vasquez requests. *See Parker v. Renico*, 506 F.3d 444, 447 (6th Cir. 2007) ("We review de novo the district court's decision to grant or deny habeas relief.").

**A**

AEDPA requires that the writ shall not issue unless we determine that the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d).

For an allegation of constitutionally ineffective assistance of counsel, the relevant "clearly established federal law" is *Strickland v. Washington*, 466 U.S. 668 (1984). A counsel's performance is a deprivation of a defendant's Sixth Amendment right to counsel where a defendant shows his counsel's assistance was both deficient and that the deficiency prejudiced the defendant. A performance is deficient only if it "fell below an objective standard of reasonableness" in light of the "prevailing professional norms." *Id.* at 687-88. And a deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Ohio trial court did not follow this clearly established law. To be sure, the court cited *Strickland* and identified a two-part test, measuring for deficiency and prejudice. But the court stated that prejudice occurs only when "the result of petitioner's trial or legal proceeding *would have been different* had defense counsel provided proper representation." (emphasis added). After reviewing both Ohio and federal law, the court repeated itself, explaining that "[i]n order to demonstrate a claim of trial counsel's ineffectiveness according to the United States Supreme Court, a post-conviction petitioner is required to demonstrate that (1) the performance of defense counsel was seriously flawed . . . and (2) the result of petitioner's trial or legal proceeding would have been different had defense counsel provided proper representation." (citing *Strickland* (without providing a pin cite)). This was not a slip of the pen during a rote repetition of a rule corrected upon application of law to fact. In analyzing Vasquez's claim as to the failure to interview and call potential defense witnesses, the court relied directly on its version of the ineffectiveness standard as crucial to its decision against relief: "perhaps most importantly, not one of the witnesses who testified [at the post conviction hearing] . . . offered any testimony that could have changed the outcome of defendant's trial." The court repeated, in the context of a different claim of ineffectiveness, that "even if the Court found that Butler's question demonstrated a deficiency . . . defendant has shown no resulting prejudice. As demonstrated above, neither the testimony of Mrs. Vasquez or Becky Shaffer would not [*sic*] have changed the outcome of the trial."

No. 07-4466
Vasquez v. Bradshaw

The Ohio Court of Appeals, reviewing for abuse of discretion,[1] repeated the error. It framed its rejection of Vasquez's appeal in terms of a changed-outcome: "defendant presented numerous witnesses who did not testify at his trial. Their absence . . . does not demonstrate his counsel was ineffective and that the outcome of his trial *would have been different* had they been witnesses . . . ." (emphasis added). In analyzing the argument, the appeals court expressly adopted the trial court's reasoning: "[w]e agree with the trial court's conclusion that 'not one of the witnesses who testified . . . offered any testimony that could have changed the outcome of defendant's trial.'"

---

[1] The Ohio appellate courts review a trial court's decision as to a post-conviction petition for relief under an abuse of discretion standard. *See, e.g.*, *State v. Gondor*, 860 N.E.2d 77, 86 (Ohio 2006). This raises an apparently unresolved question about the state decision a federal court should defer to under AEDPA. Where an appellate court reviews under an "abuse of discretion" standard, it is not adjudicating the merits of the claim so much as the merits of the decision under review. The question is only whether it fell into what is presumably a broad band of discretion. AEDPA, however, is meant to secure deference to the application of federal law by a state court in its "adjudicat[ion] on the merits" of a petitioner's claim. 28 U.S.C. § 2254(d). Accordingly, AEDPA perhaps does not have anything to say about a state court's decision that another state court did not abuse its discretion – it is concerned only with whether the *actual* adjudication of the merits of petitioner's claim was contrary to, or an unreasonable application of, federal law. On this view, we should focus our analysis on the lower court's adjudication and not the appellate court. This approach finds analogical support in our court's refusal to give AEDPA deference to a state appellate court review for plain error. *See Benge v. Johnson*, 474 F.3d 236, 246 (6th Cir. 2007) ("Because Benge could have met his burden under *Strickland* despite not being able to demonstrate plain error, this analysis did not constitute an 'adjudication on the merits' of Benge's ineffective-assistance-of-counsel claim.") (quoting 28 U.S.C. § 2254(d)). Other cases, however, have focused on the reasoning actually followed by the state court and not the standard of review applied. *See Fleming v. Metrish*, 556 F.3d 520, 530-32 (6th Cir. 2009) (distinguishing *Benge* and holding a review for plain error is an adjudication on the merits where the state appellate court first determined the merits of the claimed error before holding that it did not effect substantial rights).

Nevertheless, we do not find it necessary to resolve this issue here because we hold that the appellate court also applied law contrary to the *Strickland* standard by asking whether the outcome would have been different. We note that it is plausible that a state appellate court might, without repeating the mistake of a lower court, still affirm because it is applying a deferential standard of review.

- 12 -

This is not a casual error. A "reasonable probability" of difference does not mean "would have been different." The latter formulation puts a greater burden on the petitioner. To prevail on his claim as it was adjudicated, Vasquez was required not only to show that his counsel's deficiency "undermine[d] confidence in the outcome," *Strickland* 466 U.S. at 694, but to prove that a trial with competent counsel actually would have resulted in his acquittal. In interpreting what Congress meant in § 2254(d), the Supreme Court used a similar mistake as the paradigmatic example of an application of law "contrary to clearly established federal law" that deserves no deference under the statute. The Court explained:

> A state court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law . . . . Take, for example, our decision in *Strickland* . . . . If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to [the Court's] clearly established precedent because [it] held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'

*(Terry) Williams v. Taylor*, 529 U.S. 362, 405-06 (2001) (internal citations omitted).

Of course, the error there, picked by the Supreme Court for its clarity in illustrating application of contrary law, precisely defined the quantum of proof. The Ohio courts left it at "would have been different," unadorned by the truly offending words "preponderance of the evidence." It could be argued that, in the spirit of the deference demanded by AEDPA, we should give the Ohio trial court's statement the benefit of the doubt and assume that the court implied the words "reasonable probability." *See Holland v. Jackson*, 542 U.S. 649, 654-55 (2004) (reversing

a decision that the state court decision was "contrary to" *Strickland* because "use of the unadorned word 'probably' is permissible shorthand when the complete *Strickland* standard is elsewhere recited."). After all, as the warden argues, the appellate court, consistent with Supreme Court precedent, stated the correct standard once.

We are not persuaded. Different standards make for different outcomes. Even where a state court "explicitly delineated the *Strickland* test," its decision is "contrary to" federal law where the court applied an "incorrect burden of proof." *West v. Bell*, 550 F.3d 542, 552 (6th Cir. 2008). Indeed, our court has already held that a state's court use of a "would have compelled acquittal" formulation is "contrary to" federal law. *Tinsley v. Million*, 399 F.3d 796, 807 (6th Cir. 2005). While the appellate court did say "reasonable probability" once, the use of the incorrect words cannot be regarded as anodyne "shorthand," *e.g. Woodford v. Visciotti*, 537 U.S. 19, 23 (2002), because they actually describe and apply a different standard. The court of appeals emphasized the inability to meet the prejudice prong, underscoring whether the trial "would have been different," and expressly adopted the erroneous legal reasoning of the court below. Accordingly, we hold that the Ohio courts applied law that was contrary to clearly established federal law and we are therefore "unconstrained by § 2254(d)(1) . . . and de novo review is appropriate." *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006) (citing *Williams*, 529 U.S. at 407).

**B**

AEDPA also supplies our standard for reviewing a factual record. The statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Only if Vasquez "rebut[s] the presumption of correctness by clear and convincing

evidence" may we disregard those determinations. *Ibid.* The district court held that this burden was carried. Vasquez agrees; the warden argues strenuously that the district court erred.

Before resolving this dispute, its necessary to clarify what the issue is. The Ohio trial court's decision was opaque about its findings of fact. Its opinion, to be sure, contained a section labeled "Findings of Fact." But the section gives no definitive statement of "the facts". Nor does it resolve any of the testimonial inconsistencies discussed. Instead, it provides the background to its decision: a statement of the applicable legal rules, a summary of the factual testimony given by each witness at the post-conviction hearing, and portions of trial transcript relevant to certain post-conviction issues. None of this is the sort of "determination of a factual issue" that § 2254(e)(1) requires us to accept.

The court's "Conclusions of Law" section, however, does make a series of statements, which reveal some of the facts that it evidently found essential to its decision. The dispute over whether the district court accorded the proper deference is limited to only these statements, where the district court's "determination of a factual issue" are actually discernable from its decision. Those statements are:

- "[T]he defendant's family members refused to cooperate with the defense." Specifically, "Butler explained, and the witnesses themselves corroborated, that Mrs. Vasquez, Becky Shaffer and Mrs. Kitchen refused to cooperate in his defense"

- "Butler's explanation concerning his efforts to contact these family members and their uncooperativeness was corroborated by detective Chappelle"

- "Since Tammy Salopek was a friend of Becky's, had Becky been cooperative with Butler, he could have possible [sic] learned of her, and her daughter's availability."

In light of the number of witnesses and the relative complexity of the fact situation, this lack of detail is both surprising and frustrating to a federal court attempting to reconstruct the trial and the post-conviction hearing to decide if habeas relief is warranted. This frustration likely explains the district court's decision to conduct its own "comprehensive review" of the record and, ultimately, to rely wholesale on that review in place of the Ohio court's findings, without demonstrating which, if any, findings are specifically rebutted by clear and convincing evidence. But, whether or not understandable, the district court did not do what AEDPA required of it.

Under § 2254(e)(1), a proper comparison of these limited findings of fact to the record asks whether they are contradicted by clear and convincing evidence. The state court's findings as to Karra Vasquez and Kitchen are not. First, the state court's conclusion that Kitchen was not cooperative resolves the credibility dispute between Butler (who insisted she refused to help and said no one would) and Kitchen (who denied that she refused to help) in favor of the attorney. A reviewing court, relying on cold transcripts, is not in position to displace such a resolution. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Second, the state court's reference to the corroboration of Butler's efforts to contact Karra Vasquez means that Butler's only means of contacting Karra Vasquez was through JoAnn Kitchen. (Detective Chappelle testified to the same difficulty in contacting Karra Vasquez.) If Butler is to be believed over Kitchen, as the state court's opinion requires, Kitchen's refusal also blocked his access to Karra Vasquez.

In contrast, the court's discussions regarding Becky Shaffer is not a determination of fact that forecloses Vasquez's argument. It is true that the court grouped her with Karra and Kitchen as someone that "refused to cooperate." But it is dubious that this statement, contained in a summary

- 16 -

statement listing Karra Vasquez and Kitchen, reflects a factual determination by the court. *See Wiggins v. Smith*, 539 U.S. 510, 530-31 (2005) (evaluating a state court's conclusory factual finding in light of its explanation and denying it deference under § 2254(e)(1)). Unlike Kitchen (and Karra Vasquez, who was known to be living with Kitchen at the time Butler called her), Butler never contacted or even attempted to contact Becky Shaffer. There was therefore no opportunity for her to "refuse to cooperate" and the court could not have so determined. Instead, its reasoning that "Butler's professional opinion that Becky Shaffer would not be of assistance since her husband was a State's witness, and because of Mrs. Kitchen's representations that no one in the family would help, is a decision that is solely within defense counsel's discretion" is a better reflection of the court's holding as to Becky Shaffer. To the extent that the court relied on her "refusal," it appears from this statement that it was actually deciding that Butler's conclusion that she *would have* refused was reasonable. That was a legal conclusion and we review it as such below.

The trial court's conclusions about the EMS run-sheet also do not merit § 2254(e)(1) deference. The court concluded that the information it contained actually corroborates A.L.'s trial testimony. While credibility determinations as between counsel and potential witnesses regarding what happened pretrial must be deferred to as a factual determination, this conclusion is different. The court decided that one interpretation of the evidence (the EMS run-sheet corroborated A.L.'s testimony) was better than another (that it contradicted both A.L.'s and her father's testimony). But both would have been permissible interpretations for the jury to draw had the EMS run-sheet been presented to the jury in the first instance, and so this reasoning is actually a holding that Vasquez has not carried his burden to show prejudice resulting from his attorney's failure to identify the run-sheet

as useful impeachment evidence. *See Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007) ("[W]hat the state court has really done is to state its view that there is not a reasonable probability that the jury would believe the testimony and thus change its verdict."). Accordingly, we review it de novo below.

To reiterate, on the facts as we must take them, based on the implications of the state court's decision and the operation of AEDPA deference, Vasquez cannot base his ineffective assistance of counsel argument on the failure to investigate Karra Vasquez or JoAnn Kitchen. They refused to cooperate and any amount of investigation by Butler would not have made a difference. But Vasquez may base his claim on the failure to investigate and put in the record the EMS run sheet and Becky Shaffer's account of A.L.'s credibility. By extension, Vasquez may also rely on the testimony of Salopek and Snyder, who (by admission of the trial court) likely would have been found through an interview with Shaffer, in making his claim.

### III

The ultimate issue, then, is whether the failure by Vasquez's counsel to uncover the impeachment evidence from the EMS run-sheet, Becky Shaffer, Tammy Salopek, and Ashley Snyder resulted from deficient performance and, if so, whether it prejudiced the outcome of the trial.

### A

Constitutional competence is not a high bar for an attorney to reach. The question is whether the representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In determining whether a performance was reasonable, we give a healthy amount of deference to counsel's tactical and litigation decisions; they are "virtually unchallengeable" in the ordinary case.

*Id.* at 690. But this deference to strategic choices has always been tempered by a requirement that the choices themselves be informed: "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691 Accordingly, "a particular decision not to investigate must be directly assessed for reasonableness." *Ibid.* Our circuit has expressed this principle with more color: "the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Ramonez*, 490 F.3d at 488.

The law as developed so far has not settled on a definitive statement of what a "reasonable investigation" entails. But well established principles suggest that Vasquez's claim that his attorney failed to identify key evidence and failed to locate and interview critical witnesses is within the known contours of the duty. *See, e.g.*, *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (noting that the duty on counsel to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence."); *see also Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004) (collecting cases for the proposition that failing to investigate or call potential defense witnesses constitutes constitutionally deficient representation). That the missing evidence alleged here is impeachment evidence and not, as in some ineffective assistance cases, direct evidence of innocence does not reduce the applicability of this principle. *See Tucker v. Ozmint*, 350 F.3d 433, 444 (4th Cir. 2003) ("Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel."). This is because we are assessing the reasonableness of the

representation and the defenses available to the attorney change what is reasonable: where there are no direct witnesses to the alleged crime beyond the perpetrator and the victim, impeachment evidence is at a premium.

The circumstances ordinarily surrounding an accusation of child sexual abuse underscore this concern for developing impeachment evidence. As the Second Circuit has explained, "these cases frequently hinge on judgments about credibility in which jurors must choose between contradictory stories proffered by the defendants and the complainants" because "third-party witnesses [are] often unavailable . . . ." *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003). Thus, that court adopted a rule that "defense counsel is obliged, wherever possible, to elucidate any inconsistences in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant." *Ibid.* While adopting a unique standard of care for sexual abuse cases is unnecessary at this time, the Second Circuit's admonition is compelling here, in light of what Butler knew as he was undertaking his investigation and defense of Vasquez.

Prior to trial, Butler must have known there was no plausible defense of Vasquez other than attacking A.L.'s credibility. The only witnesses to the crime were A.L. and Vasquez, so producing a witness with a different account was impossible. There was no physical evidence for him to counter, or to demonstrate that a different person was involved. There was no possibility of an alibi;

Vasquez was undeniably in the basement with A.L. And in fact, Butler identified no defense witnesses and called none at trial.[2]

Indeed, viewing the situation (as we must) "from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, four facts were clear and should have pointed him toward the investigation necessary to put on a stronger defense. First, A.L.'s story was never crystal clear, suggesting that perhaps a well-informed cross-examination and a contradicting defense witness could have raised a reasonable doubt as to its veracity. Second, all of the people involved in the crime and its revelation were extremely interrelated, suggesting that there is a convoluted back-story that could have provided context for the jurors to understand the accusation and resolve testimonial

---

[2] The warden attributes this failure to Vasquez. It is true that Vasquez only told Butler to contact his wife and mother-in-law and, apparently, did not mention Becky Shaffer or anyone else as a potential witness. This might be a persuasive rejoinder to Vasquez's allegations if Becky Shaffer were not such an obvious person to contact because: (1) she is Vasquez's sister-in-law (at the very least, Butler may have contacted her to get in touch with Karra Vasquez); (2) the crime took place in her home; (3) she was present in the home at the time it occurred; and (4) she was present immediately after A.L.'s accusation.

This attribution is part of a strategy, on the part of both the warden and the state court, to place the attorney's failure to investigate at Vasquez's feet. While we are sympathetic to the defense attorney who has a client that will not help, we do not believe our cases to support the proposition that a defendant gets only the defense that he is capable of providing personally. (They hold only that it is not unreasonable for an attorney to limit investigation once her client has frustrated her otherwise reasonable efforts. *See, e.g.*, *Lorraine v. Coyle*, 291 F.3d 416, 435 (6th Cir. 2002)). The Sixth Amendment guarantees minimally effective representation because the adversarial testing of the state's case, a cornerstone of our criminal justice system, is very difficult without counsel. *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("In making the competency determination, the court should keep in mind that counsel's function . . . is to make the adversarial testing process work . . . .") (internal quotation marks omitted). An attorney (especially an experienced one like Don Butler) has skills and knowledge beyond the ken of an average criminal defendant. He should be expected to take a sober account of the case he is presented with and proceed to put together the best challenge to the prosecution's proof. This is true even if he must use information gleaned from discovery and investigation instead of the defendant's mouth.

inconsistencies. Third, Becky Shaffer was the sister-in-law of Vasquez, at the place of the attack on the night it occurred, and with A.L. immediately her accusation, all suggesting that she may have had information useful to the first two facts. Fourth, he had discovery materials from the state that, among other things, contained the EMS report and the names and contact information of the people the police investigated, including Becky Shaffer.

It is against this background that Butler's decisions against investigation are unreasonable. Our recent decision in *Brown v. Smith* illustrates how the thinness of the prosecution's case affects our judgment regarding an attorney's decisions against investigation. 551 F.3d 424 (6th Cir. 2008). In that case the petitioner, also convicted of child sexual abuse, alleged that his attorneys were ineffective for failing to interview the psychiatrist who had treated the accuser and lone witness. We explained that because the "entire case hinged on the credibility of [the accuser], and defense counsel were aware that [the psychiatrist] . . . had treated her near the time of the alleged assault," it was "negligent – indeed, constitutionally deficient – for Brown's attorneys not to seek *in camera* review of the counseling records . . . ." *Id.* at 431. Similar reasoning applies here: Butler knew that Becky Shaffer was ideally situated to provide information on the only avenue of defense available to Vasquez and that the EMS report contained information contradicting the version of events that the state was alleging at trial. He was therefore deficient by declining to pursue these leads.

Perhaps if Butler knew of other witnesses certain to be cooperative or physical evidence tending to show innocence, it would have been reasonable for him to focus his limited time and resources on developing a different defense based on that evidence. But he did not and so it was not reasonable to interview no potential witnesses and develop no defense. *See Williams v. Washington*,

- 22 -

59 F.3d 673, 681 (7th Cir. 1995) ("Because investigation [of the witnesses] might have revealed evidence bearing upon credibility (which counsel believed was the sole issue in the case), the failure to investigate was not objectively reasonable."); *see also Bigelow v. Williams*, 367 F.3d 562, 572 (6th Cir. 2004) (holding counsel's representation deficient because he failed to investigate a possible alibi witness once the witness's identity was discovered).

The state court held that Butler's decision was reasonable as to Becky Shaffer because of Kitchen's statement and because Becky's husband was a state's witness. Kitchen's statement makes sense as a basis to discount Karra Vasquez – Butler had to go through Kitchen to contact her – but less so for Becky Shaffer. Becky could be contacted independently and, while she was a member of the family (Vasquez's sister-in-law) and *may* have had reasons not to cooperate, it is incredible for Butler to base a decision against interviewing her on a single statement from the witness's mother. As to Becky's husband Don Shaffer being a state's witness, that could explain a decision *not to call* Becky but not why he did *not attempt to talk with her* in the first instance. *Cf. Brown*, 551 F.3d at 432 ("[O]ur quarrel is not with trial counsels' decision to forgo calling . . . a witness *per se*, but rather with the lack of any reasonable, timely investigation into what she might have offered the defense."). Moreover, neither argument takes into account that Butler knew that Becky Shaffer was likely to have relevant information and talking with her could help a develop an otherwise non-existent defense.

Using the EMS run-sheet to impeach A.L. and the other government witnesses (and as a basis for further investigation) should have been an even more straightforward decision for Butler. Through discovery, Butler had direct knowledge of the EMS report, which contained information

demonstrating inconsistencies in A.L.'s story: she described the attack then as "he put it in me" and not as Vasquez licking her vagina, and she claimed that she had taken a shower on the night of the attack (which contradicts her father's testimony that she fell asleep on the couch with her father).

The state court reasoned that there was no contradiction between the EMS report and the testimony because its possible that (1) the "it" in the EMS description was Vasquez's tongue and (2) that A.L. showered after her father went to sleep. This post hoc harmonization is not impossible as a matter of logic but does not explain Butler's indifference to the potential inconsistency (the disharmonious explanation is probably more plausible). He did not try to *find out* whether or not the testimony of A.L. and her father would stand up to impeachment on the basis of the EMS report. Moreover, Butler should have identified the report as particularly probative because it was made so close to the original report of the attack, so its inconsistency would sharply undercut the corroborative testimony based on interviews with A.L. that took place much later. For instance, penetration and licking are much different acts and the fact that A.L. may have changed her story between the two should have been recognized as premium impeachment evidence. The report further signals an opportunity to track down and interview the EMS respondent, who would have been in a position to testify as to A.L.'s demeanor in the ambulance on the way to her exam, possibly corroborating Becky Shaffer's testimony that A.L. was at ease in the ambulance and more concerned with the attention she was receiving than disturbed by the abuse she reported.

The warden argues that this line of argument is an impermissible second-guessing of Butler's strategic decision making. Accepting the patently debatable premise that the omissions discussed in this opinion were the result of a conscious strategy on Butler's part, the foregoing account of what

Butler knew (and what the prospects for Vasquez's defense were) when he decided against continued investigation demonstrates that decision was "objectively unreasonable because it was a decision made without undertaking a full investigation" and therefore not due deference. *Towns*, 395 F.3d at 259 (internal quotations omitted); *see also Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1990) ("Where counsel fails to investigate and interview promising witnesses, and therefore has no reason to believe they would not be valuable in securing defendant's release, counsel's inaction constitutes negligence, not trial strategy.") (internal quotations omitted). To this, we add only that the pretrial investigation actually admitted to by Butler – his legal research on sex abuse and child rape cases – should have pointed him toward the investigation he failed to undertake. It is well known in the literature (and the cases cited above) that the credibility of the child witness is often central to the success of child sex abuse prosecutions and that the circumstances surrounding the initial accusation of the abuse are important indicia of credibility. *See generally, e.g.*, Kamela London et al., *Disclosure of Child Sexual Abuse: What Does Research Tell Us About the Ways that Children Tell?*, 11 PSYCH. PUB. POL. & L. 194 (2005) (discussing various psychological models of children's accusations of child sexual abuse and their importance to understanding the accuracy of testimony in child sexual abuse trials). This suggests that, even without knowing what Butler knew about the available evidence, Becky Shaffer and the EMS run-sheet would be natural starting points to an investigation and a defense. Yet, Vasquez's attorney did not pursue these leads. We do not believe that this behavior can accurately be described as a "strategic choice". Instead, we hold it to be representation "below an objective standard of reasonableness" and constitutionally deficient. *Strickland*, 466 U.S. at 688.

**B**

This deficient representation only amounts to a violation of Vasquez's Sixth Amendment rights if it resulted in prejudice – a probability of a different result that is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In determining whether Vasquez has carried his burden, we must evaluate the deficiency in light of the "totality of the evidence before the . . . jury." *Id.* at 695. And so, in a case in which the "verdict or conclusion [is] only weakly supported by the record is more likely to have been affected by errors . . . ." *Id.* at 696. Accordingly, in cases like this one, where the only evidence of the crime or the defendant's guilt is the testimony of the victim, our circuit has been especially willing to find prejudice from deficient representation because "[t]he lack of physical evidence confirming sexual activity meant that this was necessarily a close case at the trial level." *Hodge v. Hurley*, 426 F.3d 368, 386 (6th Cir. 2005).

The missing evidence here undermines our confidence that had Butler pursued the leads he had immediately available to him the same outcome would have obtained. The EMS report demonstrates a specific and non-trivial difference in her story over how the attack took place: the run-sheet implies A.L. reported that there was penetration by Vasquez's penis in contradiction to the evidence at trial.[3] Becky Shaffer's account reveals inconsistences in A.L.'s timeline; that S.L.

_____

[3] The state court's harmonization that the "it" could be Vasquez's tongue is not responsive to our focus about how the jury would likely have taken it. Coupled with the inconsistency about the shower, we think it likely a jury would consider the run-sheet evidence of instability in A.L.'s story. This is especially so because it is unlikely that the jury would believe a nine-year-old would colloquially describe Vasquez's licking as "put[ting] it in," whereas she might be likely to use that term for penetration. Moreover, unlike A.L.'s story at trial, penetration is not consistent with the circumstances of the attack occurring in a short window of time, with her father's presence upstairs, and on the same bunk-bed where Vasquez's children were sleeping. In any case, the fact that we

coached A.L. and was prompting responses to the police; that she acted relaxed and not in conformity with a girl recently revealing a traumatic experience; and specific revelations that A.L.'s concern was over attention (would she get on TV) and not the crime. Speaking with her would have also led Butler to additional defense witnesses. The testimony from Salopek and her daughter, in turn, would have provided detailed reasons that A.L. is not trustworthy and does not understand the consequences of her lies; that she was not acting out-of-the-ordinary the week after she revealed the attack; and that A.L. had just learned of the sexual abuse suffered by Snyder. Together, this evidence challenges the specifics of her story, her motivations, and her general truthfulness. Moreover and equally important, it undermines the corroboration evidence presented by the state – that A.L.'s story did not change in her retelling of it, that she acted out of character after the attack, and the implausibility of a nine-year old making up such a sexual-molestation story.

The warden makes two arguments against the prejudicial effect of this missing evidence. First, the warden argues that Becky Shaffer may not have in fact cooperated because she declined to give a written statement to the investigating police officer. This fact is not as significant as the warden would have it. Shaffer did speak with the officer, but chose not to give a written statement after her husband had already given one. It is true that she did not, on her own volition, volunteer facts to the police officer, but that is not evidence of what she would have said had she been directly asked. Indeed, legally trained defense counsel are likely to ask different questions and bring a

cannot be sure about how the jury would take the evidence does not prevent a finding of prejudice, since Vasquez need only undermine our confidence in the outcome, not *prove* that a different outcome was certain with competent counsel.

different context to the investigation than the investigating police officer. The police officer was trying to establish the facts of the attack. Butler, undertaking his investigation with an understanding of the state's case, would be building a case specifically against A.L.'s version of events. He likely would have asked different questions and placed greater weight on information to present a jury. For instance, he may have focused on the ambulance ride (because it would be the best evidence of how A.L. acted immediately after accusing Vasquez) and on information about A.L.'s credibility as a witness, rather than on what happened the night of the attack. According to Becky Shaffer's testimony, such questions would have elicited the answers that now provide important impeachment evidence.

Second, the warden argues that the additional evidence was cumulative on Butler's attacks against A.L.'s credibility. To be sure, "evidence that is merely cumulative of that already presented does not . . . establish prejudice." *Getsy v. Mitchell*, 495 F.3d 295, 313 (6th Cir. 2007) (en banc) (internal quotations omitted). Our cases, however, do not tell us clearly when evidence becomes sufficiently different to no longer be "cumulative" or at what level of generality one must compare the evidence. In our most skeptical formulation, we have said, "in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented . . . ." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). In light of the weakness of the defense at trial, the missing evidence here satisfies even this high standard.

Butler used the cross-examination of the prosecution's witnesses to attack A.L.'s credibility and to imply that her story changed. For instance, A.L. admitted that she sometimes lies and that her

father has to punish her for that. A.L.'s father agreed that he sometimes had to punish her for lying. He admitted that he repeatedly went over the accusation with her to make sure she was telling the truth. He also admitted that during the eleven days between the incident and her report of it, he did not hear anything to indicate A.L. (who was visiting relatives) acted out of the ordinary. Further, Butler used A.L.'s father to demonstrate differences between the version of the attack in the police report and the version recorded as the attack history in the hospital, where A.L. did not tell the doctor that Vasquez covered her mouth or that the attack ended when her father called for her. Similarly, on cross examination Don Shaffer indicated that those same details in the hospital report were not in A.L.'s initial description of the attack to him. Butler relied on this testimony to create a narrative in closing about A.L.'s credibility, suggesting that she was caught in a lie by her father, but insisted on the truth of the accusation to avoid the consequences of having lied about it to her father.

The missing evidence is not cumulative on these narrow admissions that Butler induced on cross-examination. The missing evidence is not a restatement of the general proposition of A.L.'s untrustworthiness or the inconsistencies already raised. *Cf. Hartman v. Bagley*, 492 F.3d 347, 361 (6th Cir. 2007) (holding no prejudice where petitioner's main argument is only "contentions that counsel failed to expand on or corroborate or fully develop the factors listed in" his psychologist's report that were testified to in front of the jury). Instead, the evidence provides direct and specific challenges to her motivations (she wants to be on TV, she wants attention), her trustworthiness (she lies a lot and her friends and friends' parents confirm that she does not understand consequences of her lies), the stability of her story (the change in the EMS report, the prompting from her father), and the origins of her story (she just recently learned Ashley Snyder had been molested), each of which

was not presented to the jury via Butler's cross-examinations. The inconsistencies elicited between the hospital report and her initial report also were only sins of omission, unlike the EMS report, which contains information possibly contradicting the central fact of the crime.

Moreover, Butler's attempts at impeachment all relied on the testimony of the state's witnesses and frequently were likely unconvincing because they relied only on the state's witnesses. For instance, A.L.'s admission that she "sometimes lies" is less impressive without corroboration from additional witnesses that underscore that she lies specifically to get attention and that she frequently does not understand the consequences of her lies. *Cf. Clinkscale*, 375 F.3d at 445 (holding that corroboration evidence to defendant's alleged alibi was not cumulative because without "any corroborating witnesses [the defendant was] left . . . without any effective defense.") (internal quotations omitted). Butler's other attempts at impeachment were followed by flat rejections of the broader propositions that he tried to establish. S.L. rejected the proposition that his daughter "had a tendency to make things up." Similarly, Don Shaffer denied on cross that A.L. frequently made things up beyond "ordinary, kids fighting." The missing evidence, on the other hand, was not subject to immediate denial and so would have been less vulnerable to being discounted by the jury. *See Bigelow*, 367 F.3d at 565 (holding that additional alibi witnesses were not cumulative because of the vulnerability of the one alibi witness called).

Where, as here, the evidence that the jury did not hear provides specific impeachment evidence, we have not held it to be "cumulative" merely because other, less convincing evidence that also happened to be "impeachment evidence" was heard. *See, e.g.*, *Brown* 551 F.3d at 434-35. And this outcome makes sense, even under the "substantial difference" standard in *Hill*: the ultimate

question is not the analytical difference between the actual trial and a hypothetical one, but whether the fact of missing evidence "undermine[s] confidence in the outcome." *Strickland*, 466 U.S. at 694.

Accordingly, we hold that, in light of centrality of credibility to the prosecution's case and the strength of the missing impeachment evidence, Vasquez has demonstrated that but for his counsel's unprofessional errors there was a reasonable probability that his trial would have had a different outcome; our confidence in the verdict is indeed undermined.

**IV**

For the reasons explained, Robert Vasquez received constitutionally ineffective assistance of counsel. The Ohio courts' holding decision of no prejudice was contrary to clearly established Supreme Court precedent and Vasquez is therefore entitled to the writ of habeas corpus. The judgment of the district court is AFFIRMED.

No. 07-4466
Vasquez v. Bradshaw

GRIFFIN, Circuit Judge, dissenting.

I respectfully dissent. I disagree with the majority's conclusions that (1) the Ohio courts applied law contrary to *Strickland v. Washington*, 466 U.S. 668 (1984), (2) our review is not constrained by AEDPA and that de novo review is appropriate, and (3) Vasquez received constitutionally ineffective assistance of counsel. In my view, the majority and the district court have engaged in an impermissible reconstruction of Vasquez's trial, failed to avoid the warping effects of hindsight, and declined to afford a strong presumption that Attorney Butler's conduct fell within the wide range of reasonable professional assistance. Accordingly, I would reverse the judgment of the district court and deny the petition for a writ of habeas corpus.

I.

As the majority concedes, the district court erred by not according proper deference to the state court's factual findings and conclusions of law under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2244. The majority concludes, however, that de novo review is nonetheless appropriate because the Ohio courts applied law that was contrary to *Strickland v. Washington,* 466 U.S. at 668*; see Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006) (when a state court applies law that is "contrary to" clearly established federal law, a federal court is unconstrained by § 2254(d)(1) and de novo review is appropriate).

At the outset, I take issue with footnote 1 of the majority's opinion. In it, the majority elects to "focus" its *Strickland* analysis on the Ohio trial court's decision instead of the opinion rendered by the Ohio Court of Appeals. My colleagues base their decision on what they characterize as "an apparently unresolved question about the state decision a federal court should defer to under

- 32 -

AEDPA[,]" namely, the majority queries whether an appellate court decision, governed by an abuse-of-discretion standard, constitutes "an adjudicat[ion] on the merits" under AEDPA. 28 U.S.C. § 2254(d) (a federal court shall not grant the writ "with respect to any claim that was adjudicated on the merits in State court proceedings unless . . . .").

However, it is well-established that a federal court reviewing a habeas petition should examine the decision of the last state court "to [render] a reasoned opinion on the issue[.]" *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005), *cert. denied*, 548 U.S. 908 (2006); *see Davie v. Mitchell*, 547 F.3d 297, 315 (6th Cir. 2008); *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006). Nonetheless, the majority contends that:

> [w]here an appellate court reviews under an "abuse of discretion" standard, it is not adjudicating the merits of the claim so much as the merits of the decision under review. The question is only whether it fell into what is presumably a broad band of discretion. AEDPA, however, is meant to secure deference to the application of federal law by a state court in its "adjudicat[ion] on the merits" of a petitioner's claim. 28 U.S.C. § 2254(d). Accordingly, AEDPA perhaps does not have anything to say about a state court's decision that another state court did not abuse its discretion – it is concerned only with whether the *actual* adjudication of the merits of petitioner's claim was contrary to, or an unreasonable application of, federal law.

In "focus[ing]" its analysis almost exclusively on the Ohio trial court opinion, the majority relies on *Benge v. Johnson*, 474 F.3d 236 (6th Cir. 2007) as authority. In *Benge*, the Ohio Supreme Court analyzed the effect of an unobjected-to jury instruction in the context of plain-error analysis, not under the governing, and less burdensome, *Strickland* standard. We held that "[b]ecause Benge could have met his burden under *Strickland*[,] despite not being able to demonstrate plain error, [the Ohio Supreme Court's] analysis did not constitute an 'adjudication on the merits' of Benge's ineffective-assistance-of-counsel claim." *Benge*, 474 F.3d at 246. Indeed, the Ohio Supreme Court's

analysis was extremely limited and consisted of only two sentences, holding that "even if the jury instruction is deemed improper, such an error will not mandate reversal unless it constitutes plain error. In other words, we must determine whether 'but for the error, the outcome of the trial clearly would have been otherwise.'" *State v. Benge*, 661 N.E.2d 1019, 1025 (Ohio 1996). The Ohio Supreme Court neither mentioned *Strickland* nor the Sixth Amendment when disposing of petitioner's ineffective assistance of counsel claim.

In *Danner v. Motley,* 448 F.3d 372 (6th Cir. 2006), we reached a similar conclusion. In our review of petitioner's asserted *Strickland* error, there was "no indication in the trial court's comments that it examined Danner's Sixth Amendment claim. Nor [was] there evidence in the Kentucky Supreme Court's opinion that it considered the Sixth Amendment at all in ruling on Danner's claim." *Danner*, 448 F.3d at 376. We noted in *Danner* that "[a]ny consideration of the Sixth Amendment contained within the state case law upon which the state courts relied is too attenuated to consider the Sixth Amendment claim to have been 'adjudicated on the merits.'" *Id.*

Our decisions in *Benge* and *Danner* were primarily concerned with the state court's cursory treatment of the petitioner's *Strickland* claims and are therefore harmonious with the rule stated in *Payne* and *Davie* – we must review "the last state court [decision] to [render] a *reasoned* opinion on the issue[.]" *Payne*, 418 F.3d at 660 (emphasis added). Unlike the state court decisions in *Benge* and *Danner*, the state appellate court opinion in the present case engaged in reasoned and comprehensive analysis of Vasquez's claims under *Strickland*. This case is readily distinguishable from *Benge* and *Danner* because those decisions completely overlooked *Strickland*. The concerns addressed in the *Benge* and *Danner* decisions are simply not implicated here.

- 34 -

Thus, I respectfully disagree with the majority's approach and its characterization of *Benge* and *Danner*. I would adhere to the rule established by *Payne* and *Bell* and review the Ohio Court of Appeals decision because it was "the last state court to [render] a reasoned opinion on the issue." *Payne,* 418 F.3d at 660 (6th Cir. 2005).

II.

Next, the majority concludes that the Ohio courts applied law contrary to *Strickland v. Washington* by allegedly elevating the burden of persuasion necessary to sustain Vasquez's ineffective assistance of counsel claim. The majority thereafter launches into de novo review, reconstructing the state court trial record, analyzing "cold" post-conviction hearing testimony, and eventually holding that Vasquez is entitled to habeas relief.

In *Williams v. Taylor*, 529 U.S. 362, 386 (2000), the Supreme Court emphasized our limited role under AEDPA in adjudicating claims of state prisoners:

> [I]t seems clear that Congress intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ . . . . [F]ederal habeas courts must make as the starting point of their analysis the state courts' determinations of fact, including that aspect of a "mixed question" that rests on a finding of fact. AEDPA plainly sought to ensure a level of "deference to the determinations of state courts," provided those determinations did not conflict with federal law or apply federal law in an unreasonable way. H.R. Conf. Rep. No. 104-518, p. 111 (1996). Congress wished to curb delays, to prevent "retrials" on federal habeas, and to give effect to state convictions to the extent possible under law. When federal courts are able to fulfill these goals within the bounds of the law, AEDPA instructs them to do so.

The *Strickland* prejudice standard requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694. Here, the majority holds that the Ohio trial court's decision was contrary to *Strickland* because its opinion states that prejudice occurs when "the result of petitioner's trial or legal proceeding *would have been different* had defense counsel provided proper representation." (Emphasis added.)[1] According to the majority, the trial court's omission of the words "reasonable probability" in its recitation of the prejudice standard resulted in its application of a different, more demanding measure of proof. Also, the majority notes that the Ohio Court of Appeals correctly articulated the *Strickland* prejudice standard, but later omitted the words "reasonable probability" in its discussion. My colleagues claim that the appellate court's accurate recitation of the law neither cured the trial court's alleged error nor evidenced the appellate court's application of the proper burden of proof. I disagree.

In *Williams*, the Supreme Court defined AEDPA's "contrary to" clause: "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court." *Id.*; *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007) ("state-court decision is considered 'contrary to . . . clearly established federal law' if it is 'diametrically different, opposite in character or nature, or mutually opposed.'") (citation omitted).

---

[1]Most of the district court's opinion focuses on its conclusion that the Ohio courts unreasonably applied *Strickland*. In contrast, the majority's opinion concludes that the Ohio courts violated the "contrary to" clause, and thereafter engages in de novo review of petitioner's ineffective assistance of counsel claim.

No. 07-4466
Vasquez v. Bradshaw

In interpreting § 2254(d), the Court employed the following example of an application of law

that is "contrary to" clearly established federal law:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel
> on the grounds that the prisoner had not established by a *preponderance of the*
> *evidence* that the result of his criminal proceeding would have been different, that
> decision would be "diametrically different," "opposite in character or nature," and
> "mutually opposed" to our clearly established precedent because we held in
> *Strickland* that the prisoner need only demonstrate a reasonable probability that . . .
> the result of the proceeding would have been different."

*Williams*, 529 U.S. at 405-06 (citing *Strickland*, 466 U.S. at 694) (emphasis added).

In the present case, to accept the majority's position, a federal judge must conclude that the

omission of the words "reasonable probability"[2] from the state courts' description of *Strickland*'s

prejudice standard resulted in an application of a "diametrically different" burden of persuasion.

Such a conclusion is not supported by the facts and the law.

In *Woodford v. Visciotti,* 537 U.S. 19, 23-24 (2002) (per curiam), the Supreme Court held

that a state court's "occasional shorthand reference" to the *Strickland* prejudice standard "may

perhaps be imprecise," but it is not a repudiation of the standard that results in a decision that is

contrary to clearly established federal law. In *Visciotti*, the Court reversed the Ninth Circuit's

decision that had held that a state court's use of the word "probable" was a standard of prejudice

contrary to *Strickland*:

> The Court of Appeals made no effort to reconcile the state court's use of the term
> "probable" with its use, elsewhere, of *Strickland*'s term "reasonably probable," nor
> did it even acknowledge, much less discuss, the California Supreme Court's proper

---

[2]As previously noted, the Ohio Court of Appeals recited the correct *Strickland* standard,
verbatim, at the beginning of its opinion.

framing of the question as whether the evidence "undermines confidence" in the outcome of the sentencing proceeding. This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law. *See, e.g., Parker v. Dugger*, 498 U.S. 308, 314-316 (1991); *Walton v. Arizona*, 497 U.S. 639, 653 (1990), overruled on other grounds, *Ring v. Arizona*, 536 U.S. 584 (2002); *LaVallee v. Delle Rose*, 410 U.S. 690, 694-695 (1973) (per curiam). It is also incompatible with § 2254(d)'s "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), which <u>demands</u> that state-court decisions be given the benefit of the doubt.

*Visciotti*, 537 U.S. at 24 (emphasis added). The *Visciotti* opinion also suggests that a state court's accurate citation of *Strickland* evidences its application of the proper burden of proof. *Visciotti*, 537 U.S. at 22. Here, both state court decisions either correctly cite to *Strickland* or articulate the proper burden of persuasion standard.

Moreover, the Supreme Court has reversed our circuit on grounds substantially similar to the position espoused by the majority. In *Jackson v. Holland*, 80 F. App'x 392 (6th Cir. 2003) (unpublished), *rev'd* 542 U.S. 649 (2004) (per curiam), we had held that a state court's use of language at odds with *Strickland* evidenced its application of an elevated burden of proof:

Although the [state] court initially quoted the "reasonable probability" language of *Strickland*, it immediately followed this statement with language that "[i]n a post-conviction proceeding, the defendant has the burden of proving his allegations by a preponderance of the evidence." The [state] court later stated "it is asking too much that we draw the inference that the jury *would not have believed* Hughes at all had Melissa Gooch testified." Furthermore, the state court concluded that Jackson "failed to carry his burden of proving that the outcome of the trial *would probably have been different* but for those errors.[6]

[6]In evaluating [petitioner's] contention that the lower court should have reopened the proof in the collateral proceeding to allow Melissa Gooch to testify, the Tennessee Court of Appeals also stated that Gooch's statement "does not lead to the conclusion that the jury *would have decided the case differently* had it heard Gooch testify."

_____

\* \* \*

Even keeping mindful of the deferential gaze that we must cast upon the Tennessee Court of Criminal Appeals's decision, we must conclude that the state court merely paid lip service to *Strickland*'s reasonable probability standard before imposing an inappropriately stringent burden upon [petitioner]. Other than the initial articulation of the *Strickland* standard, there is absolutely no evidence that the state court analyzed Petitioner's claim under the proper "reasonable probability" standard. Indeed, all evidence within the opinion is to the contrary.

*Jackson*, 80 F. App'x at 407, n.6, 409 (emphasis in original) (internal quotation and citation omitted).

The Supreme Court reversed, *Holland v. Jackson*, 542 U.S. 649, 654-55 (2004) (per curiam), holding that the state court's initial recitation of the correct *Strickland* standard sufficiently established that it understood and applied the proper burden of proof, notwithstanding its "shorthand" references to it throughout the remainder of its opinion:

The Sixth Circuit also erred in holding that the state court acted contrary to federal law by requiring proof of prejudice by a preponderance of the evidence rather than by a reasonable probability. The state court began by reciting the correct *Strickland* standard:

"'[T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" App. to Pet. for Cert. 95 (quoting *Strickland*, 466 U.S., at 694).

The Sixth Circuit nevertheless concluded that the state court had actually applied a preponderance standard, based on three subsequent passages from its opinion.

- 39 -

> First was the statement that "[i]n a post-conviction proceeding, the defendant has the burden of proving his allegations by a preponderance of the evidence." App. to Pet. for Cert. 95. In context, however, this statement is reasonably read as addressing the general burden of proof in postconviction proceedings with regard to factual contentions – for example, those relating to whether defense counsel's performance was deficient. Although it is possible to read it as referring also to the question whether the deficiency was prejudicial, thereby supplanting *Strickland*, such a reading would needlessly create internal inconsistency in the opinion.
>
> Second was the statement that "it is asking too much that we draw the inference that the jury would not have believed Hughes at all had Melissa Gooch testified." App. to Pet. for Cert. 96. Although the Court of Appeals evidently thought that this passage intimated a preponderance standard, it is difficult to see why. The quoted language does not imply any particular standard of probability.
>
> Last was the statement that respondent had "failed to carry his burden of proving that the outcome of the trial would probably have been different but for those errors." *Id.*, at 98. We have held that such use of the unadorned word "probably" is permissible shorthand when the complete *Strickland* standard is elsewhere recited. *See Woodford v. Visciotti,* 537 U.S. 19, 23-24 (2002) (*per curiam*).
>
> As we explained in *Visciotti*, § 2254(d) requires that "state-court decisions be given the benefit of the doubt." *Id.* at 24. "[R]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Ibid.* The Sixth Circuit ignored those prescriptions.
>
> * * *
>
> The judgment of the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Id.; see also Urban v. Ohio Adult Parole Auth.,* 116 F. App'x 617, 627 (6th Cir. 2004) (unpublished)

(discussing *Visciotti* and *Jackson* and rejecting petitioner's argument that a state court's shorthand

description of *Strickland*, specifically, its statement that the "outcome probably would have been

different," resulted in its application of an elevated burden of proof under *Strickland*).

In the present case, it is undisputed that the Ohio Court of Appeals began its opinion by articulating the correct *Strickland* burden of persuasion standard. In the words of Judge Karpinski, writing for the Court of Appeals of Ohio, Eighth District:

> A defendant must demonstrate that trial counsel's performance fell below the objective standard of reasonable competence under the circumstances and that there exists a reasonable probability that, but for such deficiency, the outcome of the trial would have been different. *State v. Bradley* (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373.

*State v. Vasquez*, No. 82156, 2004 WL 35766, at *3 (Ohio Ct. App. Jan. 8, 2004). The court of appeal's citation to *State v. Bradley* is significant because in it, the Ohio Supreme Court accurately followed and applied the "reasonable probability" prejudice standard of *Strickland*. *Bradley*, 538 N.E.2d at 380.

The concluding paragraphs of Judge Karpinski's reasoned opinion on this ineffective assistance of counsel claim are consistent with the law of *Strickland*, although the words "reasonable probability" are not reiterated:

> During his post-conviction hearing, defendant presented numerous witnesses who did not testify at his trial. Their absence, however, does not demonstrate his counsel was ineffective and that the outcome of his trial would have been different had they been witnesses during his trial.

> On the contrary, the record shows that none of defendant's witnesses offered any testimony to support defendant's theory of innocence. None of their testimony challenges the victim's account of the events leading to defendant's convictions. We agree with the trial court's conclusion that "not one of the witnesses who testified–neither the defendant, his family or others–offered any testimony that could have changed the outcome of defendant's trial." Trial Court Findings of Fact and Conclusions of Law, p. 25.

*Vasquez*, 2004 WL 35766, at *6.

Nonetheless, my colleagues conclude that, based on shorthand language used in the opinion, the Ohio Court of Appeals applied law that was contrary to *Strickland v. Washington*. I disagree.

In reaching this conclusion, the majority makes no concerted effort to distinguish the present case from *Visciotti* or *Jackson*. This is untenable given the substantially similar imprecise or shorthand language employed by the state court in *Jackson,* which arguably misdescribed *Strickland*'s burden of proof. *Jackson*, 80 F. App'x at 407.

Also, the majority reasons that because the state trial court opinion consistently omits the words "reasonable probability," such an omission creates a stronger inference of a heightened standard of proof than an opinion that correctly recites the standard once and thereafter misdescribes it.[3] However, the state trial court opinion accurately cites both *Strickland* and *State v. Bradley*; *see Visciotti,* 537 U.S. at 22 (suggesting that a state court decision's accurate citation to *Strickland* indicates that it knows the law and the applicable burden of proof).

Under *Visciotti* and *Jackson,* the state court opinions employed permissible shorthand language describing *Strickland*'s prejudice standard, which did not result in their application of a "diametrically different" burden of proof under *Williams. See Visciotti*, 537 U.S. at 24; *Jackson*, 542 U.S. at 654; *Williams*, 529 U.S. at 405-06; *Urban,* 116 F. App'x at 627. The majority's "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law. It is also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings'

_____

[3]Because the majority focuses its analysis on the state trial court opinion, it is necessary for me to address the trial court's omission of the words "reasonable probability" instead of reviewing only the appellate court's decision.

. . . which *demands* that state-court decisions be given the benefit of the doubt." *Visciotti*, 537 U.S. at 24 (emphasis added) (citation omitted).

For these reasons, I respectfully disagree with the majority's conclusion that the Ohio courts applied law contrary to *Strickland v. Washington*. The majority has made a fundamental error. Our review of Vasquez's petition for a writ of habeas corpus should be constrained by AEDPA deference, not de novo.

## III.

The final issue is whether the Ohio Court of Appeals unreasonably applied *Strickland* to the facts. 28 U.S.C. § 2254(d)(1). I concur with the majority opinion insofar as it holds that Vasquez cannot base his ineffective assistance of counsel argument on his failure to investigate Karra Vasquez and JoAnn Kitchen. Again, pursuant to *Payne* and *Davie*, my analysis focuses on the state appellate court opinion because it is the last state court to render a reasoned decision on this claim.

A state court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts." *Irick v. Bell*, 565 F.3d 315, 320 (6th Cir. 2009) (internal quotation omitted). "[A] federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Id.* (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002) (internal quotation and citation omitted)). "[T]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect[,] but whether that determination was unreasonable – a substantially higher threshold." *Irick,* 565 F.3d at 320 (quoting

*Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008) (internal quotation and citation omitted)). After

assuming my proper role, I would hold that the Ohio courts did not unreasonably apply *Strickland*.

For Vasquez to succeed on a claim for ineffective assistance of counsel, he must satisfy the

well-rehearsed two-prong *Strickland* test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

> Moreover:

> [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . Because of the difficulties inherent in making the evaluation, a court must indulge *a strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action *might be* considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal quotation and citation omitted; emphasis added).

This high level of deference means that "[w]e address not what is prudent or appropriate, but

only what is constitutionally *compelled*." *United States v. Cronic*, 466 U.S. 648, 665, n.38 (1984)

(emphasis added). In addition, "'[s]trategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less

than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Barnes v. Elo*, 231 F.3d 1025, 1029 (6th Cir. 2000) (quoting *Strickland*, 466 U.S. at 691).

At the state court level, Vasquez's ineffective assistance of counsel claim challenged Butler's exclusion of certain family members as potential defense witnesses. Because I agree with the majority that Vasquez cannot base his ineffective assistance of counsel claim on the exclusion of Karra Vasquez and JoAnn Kitchen, my analysis focuses solely on Butler's performance regarding Becky Shaffer. Thus, if Butler's decision to exclude Becky Shaffer from his potential defense witnesses was, as the Ohio courts concluded, based on reasoned trial strategy and judgment, the issue is resolved.

The Ohio Court of Appeals concluded that "the record shows that none of defendant's witnesses offered any testimony to support defendant's theory of innocence. None of their testimony challenges the victim's account of the events leading to defendant's convictions. We agree with the trial court . . . ." In reaching its conclusion, the appellate court relied on the following findings of fact set forth in the state trial court decision:

> Butler testified that after he was assigned to the case about six weeks after arraignment, he reviewed the Court's file, the clerk's office docket, met with his client, ascertained that his client would not sign a speedy trial waiver pursuant to the Court's concern about time, and proceeded immediately to conduct research and prepare for trial. Butler filed the appropriate discovery motions [and] met with his client at subsequent scheduled pre-trials.
>
> * * *
>
> Butler explained that he didn't subpoena the family members because they were uncooperative and he had to keep in mind the other allegations of sexual molestation,

- 45 -

specifically from his sister's daughter.  He [] had to be concerned that family members would be aware of the rape allegation by [Vasquez's] four-year-old niece in California.

* * *

The defendant testified that while in County Jail, even he could not reach his wife, his sister-in-law Becky [Shaffer] or his mother-in-law, JoAnn Kitchen: none of them responded [and] [h]is wife stopped visiting him.

* * *

[] "Becky" Shaffer testified [that] she and her husband had gone to bed and did not see the [victim or her mother and father] the night [the victim] stated that Robert Vasquez raped her.

[Becky Shaffer] also suspected [Vasquez] of sexually abusing her son.

Pursuant to 28 U.S.C. § 2254(e)(1), the district court is required to apply a presumption of correctness to state court findings of fact unless the petitioner offers clear and convincing evidence rebutting this presumption.  *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).  In its review of Vasquez's habeas petition, the district court abandoned this presumption and did not circumscribe its analysis to comport with AEDPA deference.

In fact, the district court's opinion challenged only one finding of fact upon which the state appellate court relied, specifically, the fact that "[Becky Shaffer] suspected or was concerned that Vasquez had sexually abused [her son.]"  The district court found that "Becky Shaffer [actually] testified that she took her son Aaron to the hospital on the night of August 4, 2000, because Steve Loomis and 'the other police officer' [Zbikowski] told her to do so, [] not because she suspected or

was concerned that Vasquez had sexually abused [her son.]" *Id.* The district court further noted

that:

> [a] closer analysis of Becky's testimony [] makes this finding a significant stretch, if not an outright mischaracterization. This is especially so when considering the convoluted cross-examination questioning involving multi-part questions that elicited a "yes" and Becky's repeated testimony that she only took her son in the ambulance because Steve Loomis and another police officer directed her to do so.

A review of the post-conviction hearing transcript, however, does not rebut the state appellate

court's reliance upon this factual finding by clear and convincing evidence. The post-conviction

transcript contains the following colloquy between the trial court, Vasquez's counsel, and Becky

Shaffer (during Shaffer's cross-examination):

> THE COURT: Ma'am, did you tell the hospital personnel the reason you were there [at the hospital] was because [A.L.] had made the allegation –
>
> BECKY SHAFFER: Yes.
>
> THE COURT: – of rape and you wanted to see whether or not your son had been abused?
>
> BECKY SHAFFER: Yes.
>
> VASQUEZ'S COUNSEL: I'm sorry, What was your answer?
>
> THE COURT: She said yes.
>
> VASQUEZ'S COUNSEL: Thank you very much.
>
> * * *
>
> VASQUEZ'S COUNSEL: You said this is an emotional situation, correct?
>
> BECKY SHAFFER: Yes.
>
> VASQUEZ'S COUNSEL: So obviously this is a very serious situation?

BECKY SHAFFER:  Very.

VASQUEZ'S COUNSEL:  And you suspected that the same thing might have happened to your son, that's how serious it was.

BECKY SHAFFER:  I didn't know.  Yes.

Moreover, the remaining factual findings relied upon by the state appellate court remained uncontroverted by the district court.[4]  Specifically, there is ample evidence supporting the appellate court's decision to affirm the state trial court's ruling that Vasquez's family members, including Becky Shaffer, were uncooperative and unsympathetic to his defense.  Butler's decision to forgo contacting Becky Shaffer is not so "incredible" amid swirling family-based allegations of spousal abuse and separate family-based allegations of sexual molestation.  In addition, Becky Shaffer was slated to testify for the *prosecution*.  Moreover, during the post-conviction hearing, Becky Shaffer admitted that she suspected that Vasquez had sexually abused her son, a damning accusation if

---

[4]Attorney Butler was appointed to represent Vasquez approximately six weeks before his trial.  On the same day that he was appointed, Butler met with Vasquez and asked him to execute a speedy trial waiver.  Vasquez refused.  Butler filed appropriate discovery requests, researched and prepared for trial, and met with Vasquez on several occasions.  Butler decided to exclude Becky Shaffer because she was not present at the time the alleged rape occurred (she was asleep in a separate apartment, two floors above the basement level, which was the alleged crime scene), she was a close family member (Vasquez was married to her sister), and that Butler was concerned that Vasquez's family members would testify or reveal details about the separate molestation allegations levied by Vasquez's niece in California.  When Butler eventually reached JoAnn Kitchen, she informed him that the family "w[as] not going to cooperate [] [] in any way" with his defense, and that she had recently learned that Vasquez had been abusing her daughter (Vasquez's wife, Karra) for "an extended period of time."  During this same six-week period, Vasquez testified that he had been "abandoned by his family," including the same family members the majority now contends could have aided in his defense.  Vasquez made several attempts to contact Becky Shaffer, but she never responded.

revealed during his rape trial, and arguably evidencing Butler's reasonable fears about Vasquez's family's proclivity for damaging and harmful testimony.

The majority claims that Butler knew that "Becky Shaffer was ideally situated to provide information on the only avenue of defense available to Vasquez" and that she was likely to have "relevant information." The majority also asserts that Butler could have contacted Becky Shaffer independently. These statements are speculative. Furthermore, according to Vasquez's own testimony, credited by the state trial court, he had been "abandoned by his family" during the six weeks before his trial and had made several attempts to contact Becky Shaffer, but to no avail. Vasquez's concern regarding his family's abandonment appropriately influenced Butler's reasoned and strategic decision not to pursue certain defense witnesses, including Becky Shaffer.

As the Supreme Court has stated:

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends *critically* on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. *And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful*, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 691 (emphasis added).

The district court and majority rely heavily on *Ramonez v. Berghuis*, 490 F.3d 482, 484 (6th Cir. 2007) in support of their conclusion that in making his decision regarding Becky Shaffer, Butler was not functioning as the counsel guaranteed by the Sixth Amendment. In *Ramonez*, however, the

excluded defense witnesses actually *witnessed* the altercation that gave rise to the defendant's conviction. *Ramonez,* 490 F.3d at 488 (concluding that attorney's decision to exclude defense witnesses was constitutionally deficient because defendant insisted "months before trial" that the three witnesses at issue could testify to what they saw when they witnessed the altercation, and that each witness could testify that defendant did not force his way into the victim's home). Here, however, Becky Shaffer did not witness the crime. In fact, there were no witnesses to the alleged crime other than A.L. and Vasquez. Becky Shaffer's favorable testimony, if any, would be limited to impeachment, only. Thus, *Ramonez* is easily distinguishable from the present case.

The majority also holds that Butler was ineffective in failing to pursue potential impeachment evidence contained in an Emergency Medical Services report form (EMS run sheet). The hearsay evidence contained in the EMS report can be summarized as follows: When A.L. described the attack to the paramedics, she allegedly stated that "he put it in." The EMS run sheet also reports that A.L. "took a shower later that day."

The state appellate court did not rule on this issue, and the record does not reveal whether this claim was abandoned on appeal. Nonetheless, the state trial court decision (the last state court to render a reasoned decision on this matter) ruled that Butler's failure to impeach A.L. with the EMS run sheet did not prejudice Vasquez's defense because "it was consistent with her trial testimony." In its finding of facts, the state trial court found as follows:

> (B)     Claim that Counsel Did Not Cross-examine Victim Regarding EMS "Run
>              Sheet":
>
> At the hearing, Butler was presented with an unauthenticated copy of
> an Emergency Medical Services "run report" of the evening that

- 50 -

> [A.L.] was transported to the hospital. The defendant asked questions of Butler concerning the fact that an unidentified person wrote thereon: "pt. st. he put it in her." Apparently defendant was attempting to show, as he claimed via his Investigator's affidavit in his Supplement, that this notation "is in complete contradiction to [A.L.'s] trial testimony". Tom Pavlish's Affidavit at para. 4. Butler testified that his understanding of this case was that it was oral sex, more specifically, that [A.L.] accused the defendant of putting his tongue in her – he had no information that it was anything else.

The majority contends, however, that this conclusion is not a factual finding entitled to deference under § 2254(e)(1) because "this [] reasoning is actually a holding that Vasquez has not carried his burden to show prejudice resulting from his attorney's failure to identify the run sheet as useful impeachment evidence." I disagree. The trial court's finding was based in part on its determination that A.L.'s trial testimony was consistent with her EMS run sheet statements. At the very least, it is a mixed question that rests on a finding of fact, which is entitled to AEDPA deference. *See Williams,* 529 U.S. at 389.

To establish prejudice, Vasquez "must show that there is a reasonable probability that, but for [Butler's failure to discover this impeachment evidence], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In addition, AEDPA deference requires that we review the state trial court's decision for "unreasonable[ness] – a substantially higher threshold." *Irick,* 565 F.3d at 320 (quoting *Owens*, 549 F.3d at 404) (internal quotation and citation omitted).

I disagree with the majority's holding that Butler's failure to impeach A.L. with the information contained in the EMS run sheet creates a reasonable probability that but for his failure to do so, the result of his trial would have been different. *See Strickland*, 466 U.S. at 694. A.L.'s

statements, as reflected in the EMS run sheet, do not contradict her trial testimony. A.L. testified

at trial that Vasquez "lick[ed] [her] private spot . . . [with] his tongue," and answered "both" when

asked on direct examination whether he had touched her on "the inside or outside or both." Thus,

her statement that "he put *it* in" is consistent with her trial testimony.[5]

As we have explained, "in order to establish prejudice, the [] evidence . . . must differ in a

substantial way – in strength and subject matter – from the evidence actually presented . . . ." *Hill*

*v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). As the majority concedes, Butler repeatedly

impeached A.L. and other state witnesses concerning A.L.'s trustworthiness and ability to tell the

truth.

Most importantly, after according proper AEDPA deference, I do not agree that the Ohio

courts unreasonably applied *Strickland* to the facts. Butler's conduct regarding Becky Shaffer was

---

[5]Vasquez also argues that Attorney Butler was constitutionally ineffective for failing to cross-examine A.L. regarding an ambiguous notation in the EMS run sheet, that she "took a shower later that day." In its finding of facts, the state trial court found as follows:

> Mr. Pavlish states in his affidavit that information in the EMS report also states "pt. st. she took a shower later that day" is inconsistent with Stephen Loomis's testimony that "immediately after the incident [A.L.] fell asleep in his truck during the drive home and that he carried her into his home as she slept." Tom Pavlish Affidavit at para. 6. At the hearing, counsel asked Butler questions concerning this notation, to which Butler replied that the night [A.L.] was transported, she had reported an incident that took place two weeks prior.

The potential impeachment of A.L. regarding this collateral matter is only marginally relevant to the issue of whether the sexual molestation occurred. For this reason, it is not "reasonably probable" that the outcome of the trial would have been different had this collateral impeachment occurred. Most importantly, the more demanding standard of an unreasonable application of *Strickland* is clearly not met.

"reasonable precisely to the extent that [his] reasonable professional judgment[] support[ed] th[at] limitation[] on [his] investigation[,]" *Strickland*, 466 U.S. at 691, and the EMS run sheet does not contain impeachment evidence that is substantially different in strength and subject matter from the impeachment evidence presented at trial. *Hill,* 400 F.3d at 318-19.

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Here, the Ohio state court decisions were *not* unreasonable.

In conclusion, the following comments by the Ohio trial court judge to Vasquez regarding the performance of his attorney are illuminating:

> Based upon the fact that I had to sit through this trial just like everybody else did, it's probably one of the most depressing things I had to do in the last eight years, quite frankly. I'm not looking forward to saying that my last trial was probably my worst, but I think you[r] attorney did everything he could to try to convince the jury that you weren't guilty as charged. I think Mr. Butler didn't have a lot to work with.

IV.

For these reasons, I respectfully dissent. I would reverse the judgment of the district court and deny the petition for a writ of habeas corpus.